STATE OF NORTH CAROLINA v. MICHAEL RAY REESE

No. 468A83

(Filed 4 March 1987)

1. **Constitutional Law § 63; Jury § 7.11— death qualification of jury—no denial of cross-section right**

   The practice of allowing the prosecutor in a first degree murder case to "death qualify" the jury before the guilt-innocence phase of the trial does not deny defendant the constitutional right to trial by a representative cross-section of the community.

2. **Jury § 6— first degree murder case—individual voir dire not required**

   There was no merit to defendant's contention in a first degree murder case that a potential "domino effect" required individual *voir dire* and sequestration of potential jurors.

3. **Jury § 7.12— excusal of jurors for death penalty views**

   The trial court properly excused certain jurors based on answers regarding the death penalty where the answers of such jurors to the prosecutor's questions clearly disclosed that they met the standard set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985).

4. **Jury § 7.11— death penalty views—excusal of jurors for cause—refusal to permit rehabilitation**

   The trial judge did not err in refusing to permit defendant to rehabilitate certain jurors before ruling on the prosecutor's challenge for cause on *Witherspoon* grounds because several jurors apparently changed their minds when the prosecutor's general questions became more specific where the record shows no reason to believe that these jurors would have subsequently given defendant different answers from those they gave the prosecutor.

5. **Jury § 6.4— death penalty views—improper questions**

   The trial court did not err in sustaining the prosecutor's objections to questions defendant sought to ask a potential juror which impermissibly attempted to "stake out" the juror's position on the types of situations in which he would vote for the death penalty.

6. **Criminal Law § 75.10— confession—voluntary waiver of right to silence**

   There was sufficient evidence, considering the totality of the circumstances, to support the trial court's conclusion that defendant's waiver of his right to remain silent was voluntary, although defendant presented evidence that his cell was cold due to a heat outage affecting the whole building and that an officer told him that things would go better for him if he confessed, where the State presented evidence that the jail staff provided inmates with blankets and space heaters, that the heat failure occurred after defendant's confession, and that the officer did not tell defendant that things would go better for him if he confessed.

State v. Reese

7. **Criminal Law § 75.10— confession—counsel unavailable—knowing waiver of right to silence**

There was sufficient evidence, considering the totality of the circumstances, to support the trial court's conclusion that defendant knowingly waived his right to remain silent when, upon twice being informed that his appointed counsel was out of town and would not be available to advise him, defendant stated that he still desired to make a statement.

8. **Criminal Law § 75.10— confession—intelligent waiver of right to silence—attorney's desire for no further interrogation—absence of knowledge by defendant**

There was no merit to defendant's contention that he did not intelligently waive his right to remain silent because he had not been informed that his appointed attorney had asked the appointing judge to announce in open court that he wanted no further interrogation of defendant until he had a chance to talk with him and that his attorney had called the sheriff with essentially the same request.

9. **Criminal Law § 75.4— invocation of right to counsel—subsequent confession**

Defendant's Fifth Amendment right to counsel during interrogation was not violated when defendant confessed after having previously invoked his right to counsel where the trial court found upon supporting evidence that defendant initiated the conversation which led to his confession and that defendant knowingly, voluntarily and intelligently waived his right to counsel.

10. **Criminal Law § 75.4; Constitutional Law § 49— right to counsel—waiver—no knowledge of attorney's wishes**

Defendant made a valid waiver of his Sixth Amendment right to the assistance of counsel during interrogation although he had not been informed that his appointed attorney had asked the police not to interrogate defendant further until he had a chance to talk with defendant.

11. **Criminal Law § 75.4; Constitutional Law § 49— right to counsel—waiver against attorney's wishes**

The right to counsel belongs to the defendant, and he retains it even after counsel is appointed. Thus, if defendant's waiver of his right to counsel is otherwise voluntary, knowing, and intelligent, his lawyer's wishes that he not waive his right to counsel are irrelevant.

12. **Criminal Law § 169.3— admission of evidence—error cured by other evidence**

Any error in admitting an officer's identification of defendant as the man he had seen with a codefendant near a store in Aulander some time before midnight on the date in question was rendered harmless by the subsequent admission of defendant's own statement that he was the man who was with the codefendant in Aulander that evening.

13. **Criminal Law § 43.4; Homicide § 20.1— admission of photographs and color slides**

The trial court in a robbery-murder case did not err in admitting black and white photographs used to illustrate an SBI agent's verbal descriptions of

the crime scene where they were relevant to the State's attempt to prove the viciousness of the attack and the movement of the victim during and after the attack; they depicted different scenes and thus were not repetitious; and they were not so gruesome and inflammatory that their value was outweighed by their prejudicial effect. Nor did the court err in admitting color slides used to illustrate testimony by a pathologist concerning the location, type and size of the various wounds he observed on the victim.

### 14. Homicide § 15— size and health of victim—relevancy

Testimony by a robbery-murder victim's daughter to the effect that the victim was sufficiently large and able-bodied to have struggled with a single assailant was relevant and material to the State's contention that two people actively participated in the killing.

### 15. Homicide § 21.5— premeditated and deliberate murder—participation in stabbing—insufficient evidence

The evidence in a first degree murder case raised only a suspicion that defendant stabbed the victim or held her as she was being stabbed and was insufficient for submission to the jury on the issue of defendant's guilt of a premeditated and deliberate murder on the theory that he participated in the stabbing where the State introduced defendant's statement to the effect that he was outside in the car during the stabbing of a robbery victim by a codefendant, and where the State's circumstantial evidence tended to show that there was no defensive stab or cut wounds on the victim's arms, that the victim was a strong woman who could not have been subdued by the codefendant alone, that there were marks on the victim's neck suggesting a choke hold, that there were two large pools of blood and large smears of blood on the floor suggesting a struggle, that the victim indicated that there were two of them who did "it," and that defendant had concealed bloodied shoes and clothing.

### 16. Homicide § 2.1— premeditated and deliberate murder—acting in concert theory—necessity for showing mens rea

While it would not be necessary for defendant to be actually present in order to be convicted of premeditated and deliberate murder under the acting in concert theory, the requisite *mens rea*—willfulness, premeditation, and deliberation—must still be shown.

### 17. Homicide § 18.1— felony murder rule—number of victim's wounds—no imputation of premeditation and deliberation to felony participant

While the felony murder rule allows the court to dispense with proof of premeditation and deliberation in order to convict, and while the number of wounds inflicted on the victim will support a jury's determination that a killing was premeditated and deliberate on the part of the killer, neither of these principles allows the imputation of premeditation and deliberation from the person inflicting the wounds to one who is only held culpable for the murder by reason of his participation in the underlying felony.

### 18. Homicide § 18.1— premeditation and deliberation—inference upon an inference

An inference that defendant and a codefendant both intended from the start to kill a robbery victim because both men entered the victim's store un-

masked was speculative "inference stacking" and was thus insufficient to support defendant's conviction of a premeditated and deliberate murder where the only suggestion that defendant and the codefendant were unmasked was itself an inference from the silence of the record.

**19. Homicide § 18.1 — premeditation and deliberation — knowledge of codefendant's intent to kill — insufficient evidence**

There was insufficient evidence to permit a jury finding that defendant knew that a codefendant intended to kill a robbery victim so as to allow the imputation of premeditation and deliberation to defendant where there was no evidence that defendant discussed anything other than the robbery with the codefendant; there was no evidence in the guilt-innocence phase of the trial that the codefendant was not masked when he went into the victim's store; and there was no evidence presented in the guilt-innocence phase of the trial that the codefendant knew the victim or that defendant knew that the codefendant knew the victim.

**20. Homicide § 21.6 — felony murder — sufficiency of evidence**

The evidence was sufficient to support defendant's conviction of first degree murder under the felony murder rule where it tended to show that defendant and a codefendant planned to rob a grocery store, that a store clerk was stabbed to death during the robbery, and that defendant was at least constructively present during the robbery-murder and available to assist the codefendant. Whether there was sufficient evidence to show that defendant either committed the killing himself, intended that the killing take place, or even knew the killing would take place is irrelevant for the purpose of determining defendant's guilt under the felony murder theory.

**21. Criminal Law § 135.8 — first degree murder — armed robbery as aggravating circumstance — improper submission**

The trial court erred in the submission of the aggravating factor that a first degree murder was committed during an armed robbery where defendant was not properly convicted of premeditated and deliberate murder but was properly convicted only on the theory of felony murder. N.C.G.S. 15A-2000 (e)(5).

**22. Criminal Law § 135.8 — first degree murder — avoidance of arrest aggravating factor — insufficient evidence**

The trial court erred in the submission of the aggravating factor that a first degree murder was committed to avoid a lawful arrest where the only evidence relied upon to support this factor was the killing itself. N.C.G.S. 15A-2000(e)(4).

**23. Criminal Law § 135.8 — first degree murder — heinous, atrocious or cruel aggravating factor — sufficient evidence**

The trial court did not err in the submission of the heinous, atrocious or cruel aggravating factor in a first degree murder case where there was evidence that the victim struggled violently against death, that she was stabbed repeatedly, and that she remained conscious for many minutes before dying. N.C.G.S. 15A-2000(e)(9).

**24. Criminal Law § 135.7— first degree murder—sentencing hearing—Enmund issues—Pattern Jury Instruction—substitution of "would" for "might"**

In paragraph (c) of the "Enmund" Pattern Jury Instruction, N.C.P.I. § 150.10, the word "would" should be substituted for the word "might" in the phrase "contemplated that deadly force might be used."

Justice MITCHELL dissenting.

Justice MARTIN joins in this dissenting opinion.

APPEAL by defendant, pursuant to N.C.G.S. § 7A-27(a), from a sentence of death imposed by *Barefoot, J.*, following a jury recommendation, upon his conviction for first-degree murder at the 9 May 1983 Criminal Session of Superior Court, NORTHAMPTON County (judgment and sentence of death entered 18 May 1983; concurrent three-year sentence for conviction of felonious conspiracy entered 9 May 1984). Heard in the Supreme Court 9 December 1986.

Mrs. Martha Blowe Martin, night manager and cashier of the Red Apple Market in the Town of Woodland, was attacked and stabbed during the course of an armed robbery of the store occurring in the early morning hours of 3 December 1982. Mrs. Martin sustained five stab wounds and approximately ten other incised wounds and abrasions. The cause of death was two of the stab wounds, one of which severed the right jugular vein and the other an abdominal wound which perforated the portal vein and the inferior vena cava. There was no eyewitness testimony as to the attack.

Defendant was arrested on 3 December 1982 pursuant to warrants charging him with murder and armed robbery. He was subsequently indicted on 10 January 1983 for first-degree murder, armed robbery, and conspiracy to commit armed robbery. The case came on for trial at the 9 May 1983 Criminal Session of Superior Court, Northampton County, with Barefoot, J., presiding. On defendant's motion, a special venire of jurors was drawn from and selected in Bertie County. Defendant elected to remain silent and offered no evidence at the guilt-innocence phase of the trial. The jury returned verdicts of guilty of felonious conspiracy and of first-degree murder on the dual bases of premeditation and deliberation and felony murder. The charge of armed robbery was merged with the felony murder charge on submission to the jury.

At the sentencing phase of the trial, commenced on 16 May 1983, the State and the defendant presented evidence. The jury found as factors in aggravation that the murder was especially heinous, atrocious, or cruel; that it was committed during an armed robbery; and that it was done to avoid a lawful arrest. It found in mitigation that defendant had assisted the police in solving the crime. The jury recommended a sentence of death, and the trial judge sentenced defendant accordingly. Defendant appealed to this Court as a matter of right pursuant to N.C.G.S. § 7A-27(a) (1986). The State failed to pray judgment on the conviction of felonious conspiracy, and a resentencing hearing was held before the same judge at the 9 May 1984 Criminal Session of Superior Court, Northampton County, by special commission of the Chief Justice of this Court, for the purpose of acting on the State's prayer for judgment on the felonious conspiracy conviction. At the hearing, the trial judge denied defendant's motion to dismiss the State's prayer for judgment and sentenced defendant to the presumptive term of three years to run concurrently with the death penalty. Defendant gave notice of appeal to the Court of Appeals. His motion to bypass the Court of Appeals was allowed by this Court on 5 June 1985.

*Lacy H. Thornburg, Attorney General, by Barry S. McNeill, and Thomas J. Ziko, Assistant Attorneys General, for the State.*

*Rosbon D. B. Whedbee and Mitchell S. McLean for defendant-appellant.*

MEYER, Justice.

Defendant raises numerous assignments of error in both the guilt-innocence and sentencing phases of his trial. These assignments can be grouped into four categories: errors in jury selection, errors in the guilt-innocence phase of the trial, errors in sentencing, and the disproportionality of the sentence. We find that there were no errors in jury selection. However, we find that there was insufficient evidence to support the jury's verdict of guilt on the theory of premeditation and deliberation. There was also error in the submission of two aggravating factors in the sentencing hearing. This error requires a resentencing on the felony-murder conviction. The proportionality of defendant's sentence is accordingly not properly before us here.

On the night of Thursday, 2 December 1982, Mrs. Martha Blowe Martin was working the 11:00 p.m. to 7:00 a.m. shift at the Red Apple Market. She was the only employee on that shift. Between midnight and about 12:50 a.m. on 3 December, she was seen in the store by several customers and a citizen on Community Crime Watch duty. Shortly thereafter, she was brutally attacked and stabbed by one or more assailants. At approximately 1:00 a.m., Mrs. Frances Johnson, who had gone to the store to purchase an item, found Mrs. Martin lying on the floor of the store in a pool of blood, still alive but mortally wounded. Mrs. Johnson rushed home and informed her husband that something had happened at the Red Apple Market. Mr. Johnson then telephoned the wife of the Chief of Police of Woodland, who contacted her husband by radio.

When Woodland Police Chief Joseph White arrived on the scene at 1:17 a.m., he first checked the store to see if anyone else was there and then knelt beside the victim to see what he could do. She was still alive. He cleared her mouth and throat and asked her if she knew "who did it." She nodded and mumbled something that sounded like "Harmon" or "hundred." Police Chief White confirmed at the sentencing hearing that it did not sound at all like "Reese." Since Mrs. Martin was having difficulty speaking, Chief White told her to respond to his questions by nodding "yes" or shaking her head "no." He then asked her if "they" were white, and she shook her head, indicating "no"; if "they" were black, and she nodded, indicating "yes." He asked if "they" were young, and she nodded, indicating "yes"; if "they" were old, and she shook her head, indicating "no." He then asked if there were more than one, to which she nodded, indicating "yes"; if there were two, to which she nodded, indicating "yes"; and if there were three, to which she shook her head, indicating "no." Some of these questions and responses were repeated. The victim died minutes later, just before the rescue squad arrived. An autopsy revealed that she had received five stab wounds, six abrasions, two cuts, and some bruises. She died from two of the stab wounds.

After interviewing witnesses who had been near the store between midnight and 1:00 a.m., the sheriff's department put out an APB (all points bulletin) for a blue vehicle occupied by two young black men. Such a vehicle had been seen leaving the Red

Apple. The witness who reported it, Johnny Vincent, another Woodland resident, did not identify either of the two men. As a result of the APB, Chief Deputy Otis Wheeler, the officer in charge of the case, received a telephone call from Police Chief Jerry Hathaway of Aulander. Chief Hathaway reported seeing such a car in Aulander earlier in the evening in front of the Red Apple there. He had taken the license number of the car. A check disclosed that the car was registered to one Della Futrell Harmon of nearby Conway. Deputy Wheeler went to the Harmon residence, where he found one Lynvelt Harmon. He also found and impounded the car, a blue 1972 Plymouth. At some time in the afternoon of 3 December, after talking to Harmon, Deputy Wheeler obtained warrants for the arrest of both Harmon and defendant. Chief Hathaway later identified Lynvelt Harmon and defendant as the two men he had seen in the blue car in front of the Red Apple in Aulander.

Defendant turned himself in on the evening of 3 December 1982 before the warrants against him were otherwise served. He was given *Miranda* warnings, but nevertheless made a statement denying any involvement. When Deputy Wheeler indicated disbelief, defendant refused to talk further and asked for a lawyer. Three days later, defendant made a statement admitting involvement in the robbery only. According to this statement, he and Harmon had first gone to Aulander to rob the Red Apple. They had decided not to because of the number of people around. It had been Harmon's idea to go back to Woodland and rob the Red Apple there. Defendant had objected because he was known in Woodland and was afraid of being identified. Harmon had ridiculed defendant's fears and proposed that he, Harmon, would go into the store with a knife and force the clerk to lie face down. Defendant could then go in and take the money from the cash register. The clerk would thus never see defendant. Defendant finally agreed. When it appeared that Mrs. Martin was alone, Harmon went in. After an interval, defendant followed and, also according to his statement, was horror-stricken to find Mrs. Martin on the floor, bleeding. Defendant grabbed some money from the cash register. As they were leaving, defendant asked Harmon if he had the knife. Harmon had left the knife near the body. Defendant picked up the knife; wiped it on his clothing; and after the two

were in the car, asked Harmon what to do with the knife. Harmon said to throw it out, and defendant did so.

Defendant's statement indicated that his shoes and clothing had blood on them. The shoes were never found. Defendant's clothing had been washed by the time it was turned over to the police. Three tiny drops of human blood, two of which were submitted for analysis and found to be human rather than animal, were found on the running board on the passenger's side of Harmon's car. A small blood smear was also found on the back rest on the passenger's side seat. Neither the age nor the blood type of these spots could be determined.

The State introduced no evidence connecting defendant to the crime other than his confession and the physical evidence.

At trial, the State argued that defendant's confession was false in certain key respects and that the defendant had himself participated in the stabbings. First, the State argued that two people must have stabbed Mrs. Martin. She had marks on her throat that could have been made by a cord used to choke the victim, and there were no defense-type knife wounds on her hands and arms; thus, the State argued, her arms had been held while she was being stabbed. Although the pathologist who performed the autopsy testified that his findings were consistent with a frantic attack by either one or two assailants, the State argued that the difference in physical stature between Harmon and the victim[1] and the lack of defensive knife wounds proved that Harmon alone could not have both held and stabbed her. Second, the prosecutor argued that the defendant made no attempt to conceal his identity. Because defendant committed an armed robbery of someone who could identify him, he must have intended to leave no witness. The prosecutor argued that defendant must not have concealed his identity because he had not said in his statement that he was masked. Although defendant's statement indicated he had seen the victim "millions" of times, no direct evidence was admitted on the witness elimination theory.

1. The victim was in her late forties, five feet, three inches tall, weighed 160 pounds, and was capable of performing tasks normally done by women of her age. Harmon was nineteen years old, just over six feet tall, and weighed about 137 pounds.

The State elected not to try Harmon and defendant together; nor did Harmon testify at defendant's trial. Harmon was subsequently tried separately on the identical charges. The State accepted a plea of guilty to armed robbery, and Harmon was sentenced to the mandatory minimum fourteen-year term of imprisonment.

Other pertinent facts will be discussed herein as they relate to our treatment of specific issues.

## JURY SELECTION ISSUES

[1] Defendant argues first that the practice of allowing the prosecutor to "death qualify" the jury before the guilt-innocence phase of the trial denied him the constitutional right to trial by a representative cross-section of the community. He contends that such juries may be more prone to convict than non-death qualified juries. This Court has repeatedly rejected defendant's argument, see, e.g., State v. Rogers, 316 N.C. 203, 341 S.E. 2d 713 (1986); State v. Wingard, 317 N.C. 590, 346 S.E. 2d 638 (1986), as has the United States Supreme Court, Lockhart v. McCree, 476 U.S. 162, 90 L.Ed. 2d 137 (1986).

[2] Defendant next contends that the trial judge erred in denying his motion for individual voir dire of jurors and sequestration of jurors during voir dire. His argument is that group voir dire allows a so-called "domino effect": when prospective jurors are allowed to hear questions addressed to other jurors, they quickly discover the type of responses or answers that will free them from jury duty. Defendant bolsters this argument with the fact that some jurors apparently changed their minds about the death penalty during the course of the voir dire.

Motions for individual voir dire and jury sequestration are directed to the discretion of the trial judge. State v. Jackson, 309 N.C. 26, 305 S.E. 2d 703 (1983); see N.C.G.S. § 15A-1214 (1983). The exercise of this discretion will not be reversed on appeal absent a showing of abuse. State v. Barts, 316 N.C. 666, 343 S.E. 2d 828 (1986); State v. Jackson, 309 N.C. 26, 305 S.E. 2d 703. This Court has specifically rejected defendant's argument that a potential "domino effect" requires individual voir dire and sequestration. See State v. Oliver, 302 N.C. 28, 274 S.E. 2d 183 (1981); State v. Barfield, 298 N.C. 306, 259 S.E. 2d 510 (1979), reh'g denied, 448

U.S. 907, 65 L.Ed. 2d 1137 (1980). The trial judge may presume that prospective jurors will be truthful about their beliefs. The simple fact that some jurors disclosed opposition to capital punishment only upon closer questioning does not by itself show that the judge erred in this presumption.

[3] Defendant next contends that the trial judge erred in excusing certain jurors based on answers regarding the death penalty that did not meet the standard set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776 (1968). In *Witherspoon*, the United States Supreme Court held that jurors could not be excluded for cause for expressing conscientious objections to the death penalty unless their answers made it "unmistakably clear" that they would automatically vote against the death penalty or that their views would prevent them from making an impartial decision about a defendant's guilt. *Id*. at 522 & n.21, 20 L.Ed. 2d at 785 & n.21. In 1985, the United States Supreme Court "clarified" *Witherspoon* and held that the proper standard was whether a juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L.Ed. 2d 841, 851-52 (1985) (quoting from *Adams v. Texas*, 448 U.S. 38, 45, 65 L.Ed. 2d 581, 589 (1980) ). We have carefully examined the voir dire testimony of each of the jurors whom defendant contends were improperly excluded. Their answers to the prosecutor's questions clearly disclose that they met the standard set forth in *Witt*. Accordingly, the trial judge did not err in allowing them to be excused for cause.

[4] Defendant also contends that the trial judge erred in refusing to allow him to rehabilitate certain jurors before ruling on the prosecutor's challenge for cause on *Witherspoon* grounds. Defendant argues that these jurors had apparently changed their minds, rendering their positions on the death penalty "ambiguous," and that examination by defendant could have clarified these "ambiguities."

The regulation of the manner and extent of inquiry by counsel at the voir dire rests largely in the trial judge's discretion. *State v. Bracey*, 303 N.C. 112, 277 S.E. 2d 390 (1981).

When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor

and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged.

*State v. Oliver*, 302 N.C. at 40, 274 S.E. 2d at 191 (citations omitted). We have carefully examined the testimony of those jurors who defendant claims might have been rehabilitated. Defendant has made no showing that additional questioning might have produced different answers. Although he emphasizes that several jurors apparently changed their minds when the district attorney's general questions became more specific, we find in the record no reason to believe that these jurors would have subsequently given defendant answers different from those they gave the prosecutor. We note that defendant's only attempt at rehabilitation was unsuccessful in obtaining different answers from juror Bessie Byrd or saving her from challenge. Defendant has failed to show an abuse of discretion.

[5] Finally, defendant argues that the trial court erred in sustaining the prosecutor's objections to questions defendant sought to put to a potential juror. Defendant's questions appear on examination to be merely an impermissible attempt to "stake out" the juror's position on the types of situations in which he would vote for the death penalty. *See State v. Bracey*, 303 N.C. 112, 277 S.E. 2d 390. Accordingly, we find no error in the trial judge's decision to sustain the prosecutor's objections.

## GUILT-INNOCENCE PHASE

Defendant's first argument relating to the guilt-innocence phase of his trial is that the judge erred in admitting defendant's pretrial statement into evidence. Defendant contends that the taking of the statement violated both his fifth amendment right to remain silent and his sixth amendment right to assistance of counsel.

The combination of a number of important factors makes the taking of the statement and its admission into evidence particularly significant to defendant's case. There was no eyewitness to the killing; the coparticipant, Harmon, did not testify at defendant's trial; and defendant did not testify during the guilt-inno-

cence phase. There was no direct testimony which placed defendant inside the store when the actual stabbing took place. Thus, the content of defendant's statement was, other than the physical facts, the only evidence presented as to defendant's participation in the events that transpired inside the store. While there is other substantial evidence of defendant's participation in the *robbery*, his statement is the only nonphysical evidence of his participation in the actual *killing*. The statement therefore is particularly significant to the State's premeditation and deliberation theory. Because of its importance, we treat the taking and admission into evidence of this statement at length.

The warrants for defendant's arrest were issued on 3 December 1982. On that evening at about 8:00 p.m., the defendant, with his father present, surrendered himself at the Murfreesboro Police Department. He was taken to the Northampton County Sheriff's Department where Chief Deputy Sheriff Otis Wheeler, in the presence of SBI Agent Eugene Bryant, Chief of Police Joseph White, and Deputy Sheriff Edward Buffaloe, advised the defendant that a warrant had been issued for his arrest on a charge of murder. After apprising the defendant of the charge against him, Deputy Wheeler advised him of his *Miranda* rights, including his right to remain silent, his right to talk to an attorney before answering questions, his right to have an attorney present during questioning, his right to have an attorney appointed to represent him, his right to stop answering questions at any time, and his right to stop answering questions until he talked to an attorney. After Deputy Wheeler read the defendant each of his rights, he asked if the defendant understood that right. Defendant indicated that he understood each of his rights. In fact, defendant testified on 14 March 1983 at his suppression hearing that he had understood each of his rights at that time and had voluntarily agreed to talk to Deputy Wheeler. After being advised of his rights and indicating that he understood each of his rights, the defendant signed a waiver of rights form indicating his desire to waive his rights.

After being advised of his rights and executing a waiver of his rights, the defendant gave a short statement to Deputy Wheeler in which he claimed to have last seen the codefendant, Lynvelt Harmon, at 9:30 p.m. on the night of the murder. The defendant told Deputy Wheeler that he did not go to Aulander

with Lynvelt Harmon on the night of the crime. After the defendant had made his statement, Deputy Wheeler said he did not believe that defendant had not been to Aulander that night. The defendant reiterated his claim and then terminated the interrogation by saying, "Why don't you carry me to jail? I've told you all I'm going to tell you. I don't know what you're talking about till [sic] I talk to a lawyer."

The defendant remained confined in the Northampton County Jail from the evening of Friday, 3 December 1982, until the morning of Monday, 6 December 1982, at which time he was taken to the Northampton County District Court for his first appearance. During that first appearance, the defendant requested court-appointed counsel, and the court informed him that Rosbon Whedbee would defend him. After his appearance, the defendant was returned to the Northampton County Jail. During the time they were transporting the defendant to and from the courtroom, the law enforcement officers had no conversation with the defendant about the charges against him.

Later in the afternoon of Monday, 6 December 1982, Deputy Buffaloe had occasion to deliver to the defendant in his jail cell an order directing him to appear and submit to certain nontestimonial identification procedures, i.e., the removal of hair and blood samples. While Deputy Buffaloe was serving the nontestimonial identification order on him, the defendant asked, "Where is Otis Wheeler?" In response to defendant's inquiry, Deputy Buffaloe stated that he thought Deputy Wheeler had gone home and asked the defendant why he wanted to know. The defendant then said, "I wanted to see him, I might want to talk to him—you know."

Deputy Buffaloe left the jail, telephoned Deputy Wheeler at his home, and informed him that the defendant had requested to see him. Upon being notified of defendant's request, Deputy Wheeler left his home and arrived at the defendant's jail cell approximately ten or fifteen minutes after the conclusion of the defendant's conversation with Deputy Buffaloe.

The defendant testified at the suppression hearing that following the arrival of Deputy Wheeler, the following conversation occurred:

A. He asked me, said, You want to see me? and I said, Yes, sir, I said, Wait—can you get in contact with my lawyer?[2]

After this short exchange, Deputy Wheeler left the jail for approximately five or ten minutes.

The defendant testified that once Deputy Wheeler returned to the jail cell, the following conversation occurred:

[T]hen he come back, said, Your lawyer is out of town. Then he told me, said, Well, if you got anything to say—you know —it would be better for you to say it—you know—he told me it was another guy over at—I think it was another attorney —you know—if I got anything to say it would be better, and I said, Yeah, I would like to talk to you, so we left and went over there to the courtroom—I mean—over to his office and we talked.[3]

Both the defendant and Deputy Wheeler testified to the effect that Deputy Wheeler did not approach the defendant until after the defendant had asked for him. Moreover, the defendant could not recall telling Deputy Wheeler on that day that he did not want to talk to him, but would rather wait until he could talk to his lawyer. In fact, the defendant admitted that he had told Deputy Wheeler that he wanted to tell "[his] side of the story."

After the defendant had been informed that his lawyer was unavailable and after the defendant had reiterated his desire to talk to Deputy Wheeler, he was taken from his cell to Deputy Wheeler's office where a member of the district attorney's staff, Mr. Sam Barnes, was waiting with a tape recorder. Once the defendant was in his office, Deputy Wheeler again advised him of his *Miranda* rights. After being advised of his rights, the defendant executed a form indicating his desire to waive those rights and make a statement. The defendant's signature on the waiver of rights form was witnessed by Mr. Barnes. After the defendant

2. This testimony substantially corroborates the testimony of Deputy Wheeler with the exception that Deputy Wheeler testified that he, rather than the defendant, interrupted the conversation to attempt to contact the defendant's attorney.

3. This testimony is in substantial agreement with Deputy Wheeler's testimony, with the exception that Deputy Wheeler denied telling the defendant it would be better if he gave a statement.

had executed the waiver of rights form, Deputy Wheeler made the following statement to him:

> Mike, Michael besides these warning[s] of your right[s] you know I have told you that the court has appointed Mr. Whedbee of Ahoskie to represent you on these charges, Mr. Whedbee is now in Winston-Salem and will not be back until Wednesday. With this in mind you still want to tell me what you want to talk to us about, what happened and tell your side of it.

In response to this information, the defendant once again indicated that he desired to talk to Deputy Wheeler and tell him his version of the events on the night of the murder.

Prior to trial, counsel for the defendant filed a timely motion to suppress the statement the defendant had given Deputy Wheeler on the night of 6 December 1982. A hearing on the defendant's motion to suppress was held on 14 March 1983. The transcript of the hearing on defendant's motion to suppress reveals this question on cross-examination and Deputy Wheeler's response:

> [Q.] . . . After taking the statement from him what, if anything, did you do at that time?

> A. After he got through making the initial statement, I went back over this thing about he knew his lawyer was not present and knew his lawyer could not be present. He still wanted to talk to us and he did talk to us and it was freely on his own. He said, Yes, sir.

Indeed, the transcript of defendant's taped statement (State's exhibit No. 40) contains these words, spoken near the beginning of the tape:

> Wheeler: You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until

you talk to a lawyer. Ok I have read or have had read to me this statement of my right[s] and I understand what my rights are. With these rights in mind, I am willing to make a statement and answer questions. I do not want a lawyer at this particular time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me. Is this true?

Reese: Yes Sir.

Wheeler: Ok, if you will sign your name here. The time is December 6, 1982, at seven minutes past six. Mike, Michael besides these warning[s] of your right[s] you know I have told you that the court has appointed Mr. Whedbee of Ahoskie to represent you on these charges, Mr. Whedbee is now in Winston-Salem and will not be back until Wednesday. With this in mind you still want to tell me what you want to talk to us about, what happened and tell your side of it.

Reese: Yes Sir.

At the conclusion of that hearing, the court denied the defendant's motion to suppress his statement. During the trial, the defendant renewed his motion to suppress his statement on grounds that he did not knowingly waive his right to counsel prior to making the statement and that the statement had been obtained in violation of the United States Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378 (1981). At that time, the trial court again denied the motion to suppress and made the following findings of fact:

The Court finds as a fact that the defendant on his own request caused Officer Otis Wheeler to come to the Northampton County Jail from his home from an afternoon off where he was fixing dinner for his wife; that upon arriving at the Northampton County Jail, the defendant informed him that he wanted to make a statement — a voluntary statement; that he was again advised of his rights, he was informed that an attorney had been appointed for him that day; that his attorney was in Winston-Salem and that he had the right to wait for him and talk with him prior to making any voluntary statement that he wanted to make; that the defendant said that he knew that he had an attorney — that an attorney had

been appointed for him; that he wanted to, quote, get it off his chest. He signed and was advised of all his "Miranda" rights, freely, voluntarily and of his own accord signed a waiver of all the rights that he had.

Following the court's decision to deny the motion to suppress, the defendant's statement was read into evidence.

Defendant next makes a series of related arguments regarding the denial of his motion to suppress his statement and its subsequent admission at trial. He argues that both his fifth and sixth amendment rights were violated in the taking of the statement by the police and that his confession should therefore have been suppressed by the trial judge. We disagree.

Defendant first argues that the statement was taken in violation of his fifth amendment right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966). The State contends that defendant effectively waived his rights. Fifth amendment rights may only be waived if that waiver is made knowingly, voluntarily, and intelligently. *Moran v. Burbine*, 475 U.S. 412, 89 L.Ed. 2d 410 (1986); *Johnson v. Zerbst*, 304 U.S. 458, 82 L.Ed. 1461 (1938).

The test for the effectiveness of the waiver was set out by the United States Supreme Court in *Moran*:

> The inquiry has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran*, 475 U.S. at 421, 89 L.Ed. 2d at 421 (citations omitted).

[6] Defendant first argues that the "totality of the circumstances" in this case compels a conclusion that his confession was not voluntary. As evidence for this proposition, the defendant points to the fact that his cell was unheated and to his con-

tradicted testimony that Deputy Wheeler told him that things would go better for him if he confessed. He concludes that his confession was the result of threats and promises on the part of the police and should have been suppressed as involuntarily made. *See Brady v. United States,* 397 U.S. 742, 25 L.Ed. 2d 747 (1970).

The State first contends that there was sufficient evidence to support the trial judge's conclusion that defendant voluntarily waived his right to remain silent. While it is apparently true that defendant's cell was cold (due to a heat outage affecting the whole building), there was also evidence that the jail staff provided the inmates with blankets and space heaters. Moreover, members of the defendant's family came to visit him but apparently did not bring him blankets. Finally, the State's evidence was that the heat failure occurred after the defendant's confession. As to the statement attributed to Deputy Wheeler to the effect that it would go better for defendant if he confessed, the State's evidence was that no such statement was made, that the defendant sought out Deputy Wheeler to make a statement, and that no promises or inducements were offered in exchange. Such conflicts or contradictions in the evidence are for the finder of fact to weigh. *State v. Jenkins,* 311 N.C. 194, 203, 317 S.E. 2d 345, 350 (1984). The trial judge concluded that the defendant's statement was voluntarily made. Considering the totality of the circumstances, it appears that there was sufficient evidence to support the trial judge's conclusion that the waiver was voluntary.

[7] Defendant next contends that his waiver was not knowing. We disagree. The totality of the circumstances here reveal a 24-year-old adult with a twelfth grade education who had previous experience with law enforcement authorities and was aware of his rights as a suspect in a criminal proceeding. After a warrant had been issued for his arrest for first-degree murder, the defendant, knowing he had been charged with first-degree murder, turned himself in to the authorities. On that same night he was advised of his *Miranda* rights and waived those rights prior to giving a short statement denying any involvement in the crime in question. When the investigating officer disputed the truthfulness of the defendant's statements on that occasion, the defendant himself terminated the interrogation by insisting upon his right to silence and his right to assistance of counsel. Defendant was in-

carcerated in the Northampton County Jail for three days. During that time, defendant's family visited with him and he had several encounters with law enforcement authorities that did not lead to any interrogation relevant to the investigation of the crime in question. After being in jail three days, the defendant, on his own initiative, indicated a desire to speak with Deputy Wheeler, the officer who had interrogated him earlier. When Deputy Wheeler arrived at the defendant's cell, the defendant indicated that he wanted to make a statement and get the whole matter off his chest. Deputy Wheeler, knowing that the defendant had been appointed counsel, reminded defendant of that fact, then left the defendant for a short time to find out whether the defendant's counsel could be contacted. When he was informed that defendant's counsel would not return to Northampton County for several days, Deputy Wheeler returned to the defendant's cell and told him that his attorney was out of town. Deputy Wheeler then asked the defendant if, in light of that fact, he still desired to make a statement. Despite being informed that counsel would not be available to advise him, the defendant stated that he nevertheless wanted to speak to Deputy Wheeler. The defendant was then removed from his cell and taken to Deputy Wheeler's office, where, in the presence of a member of the district attorney's staff, he was once again advised of his *Miranda* rights and waived those rights. After having waived his rights, the defendant was once again asked whether, knowing he had been appointed a lawyer and knowing that his lawyer would not be available to assist him until Wednesday, he still wanted to make a statement. Defendant reiterated his desire to make a statement and then proceeded to give the statement which was introduced into evidence. We conclude from the totality of the circumstances that the waiver was knowingly made.

[8] Defendant insists, however, that while his waiver may have been knowing and voluntary, it was not intelligently made. When defendant's attorney was first appointed — only a few hours before defendant gave Deputy Wheeler his inculpatory statement — the attorney was in Winston-Salem, unable to return for at least a day. He asked the appointing judge to announce in open court that he wanted no further interrogation of defendant until he had a chance to talk with him. The attorney also called the sheriff with essentially the same request, but the sheriff neither agreed

nor disagreed. Defendant was never told that his attorney had made these requests. He contends that had he been informed of his attorney's instruction, he would not have confessed.

In *Moran v. Burbine*, the United States Supreme Court was confronted with a somewhat similar situation. In that case, Burbine had been arrested for burglary by local police, who were informed by telephone that he was connected with a murder in another city. He was held for questioning. A public defender, acting at the behest of the defendant's sister with regard to the burglary charge, called the police who were holding the defendant and informed them that she would be acting as defendant's legal counsel in the event the police intended to question defendant. The public defender was told that defendant would not be questioned and was not informed that defendant was a suspect in a murder case. The defendant was not informed that counsel had been retained or that counsel had called and was trying to reach him. Defendant was, in fact, questioned that night and, after being informed of his *Miranda* rights, executed a written waiver and signed three statements admitting the murder. The state court denied defendant's motion to dismiss, and he was convicted of the murder. The Supreme Court of Rhode Island affirmed the conviction, and the United States District Court rejected defendant's claims that the police violated his fifth and sixth amendment rights. The United States First Circuit Court of Appeals reversed, finding that the "[d]eliberate or reckless" conduct of the police, in particular their failure to inform defendant of the telephone call, fatally undermined the validity of the otherwise proper waiver and required the exclusion of the three inculpatory statements. The United States Supreme Court reversed, saying:

> We find this conclusion untenable as a matter of both logic and precedent.
>
> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self in-

terest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. . . .

. . . .

. . . [R]eading Miranda to require the police in each instance to inform a suspect of an attorney's effort's [sic] to reach him would work a substantial and, we think, inappropriate shift in the subtle balance struck in that decision. Custodial interrogations implicate two competing concerns. On the one hand, "the need for police questioning as a tool for effective enforcement of criminal laws" cannot be doubted. Admissions of guilt are more than merely "desirable," they are essential to society's compelling interest in finding, convicting and punishing those who violate the law. On the other hand, the Court has recognized that the interrogation process is "inherently coercive" and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion. Miranda attempted to reconcile these opposing concerns by giving the *defendant* the power to exert some control over the course of the interrogation. Declining to adopt the more extreme position that the actual presence of a lawyer was necessary to dispel the coercion inherent in custodial interrogation, the Court found that the suspect's Fifth Amendment rights could be adequately protected by less intrusive means. Police questioning, often an essential part of the investigatory process, could continue in its traditional form, the Court held, but only if the suspect clearly understood that, at any time, he could bring the proceeding to a halt or, short of that, call in an attorney to give advice and monitor the conduct of his interrogators.

. . . Because, as Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation

process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt. . . . Because neither the letter nor purposes of Miranda require this additional handicap on otherwise permissible investigatory efforts, we are unwilling to expand the Miranda rules to require the police to keep the suspect abreast of the status of his legal representation.

*Moran v. Burbine*, 475 U.S. at 422-23, 426-27, 89 L.Ed. 2d at 421-22, 424-25 (citations omitted; footnote omitted).

We conclude from the totality of the circumstances that defendant made an intelligent, as well as knowing and voluntary, waiver of his fifth amendment rights.

**[9]** Defendant's next argument is that his fifth amendment right to the presence of counsel during interrogation was violated. *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378 (1981).

It is defendant's contention that he invoked his right to the presence of counsel on 3 December when he said "I don't know what you're talking about till [sic] I talk to a lawyer." He argues that he was interrogated after invoking his right to counsel. Defendant concludes that the statement should have been suppressed as resulting from a fifth amendment violation.

The State agrees that defendant's right to the presence of counsel had already attached when the defendant's statement was taken on 6 December. It is the State's contention that the defendant effectively waived this right before confessing when he initiated the conversation with Deputy Wheeler.

As we have already noted, the evidence was in conflict regarding whether the defendant or Deputy Wheeler initiated the contact leading to the defendant's confession. The trial judge found that the defendant himself renewed the contact with the police. Such determination is binding upon us on appeal, as there is ample evidence in the record to support it. We take it as fact, therefore, that the defendant initiated the further contact with the police when he asked to speak to Deputy Wheeler. There is

no fifth amendment violation where the defendant himself initiates the conversation. *North Carolina v. Butler*, 441 U.S. 369, 60 L.Ed. 2d 286 (1979). We conclude therefore that there was no violation of the *Edwards* prohibition against police reinitiation of interrogation.

Even when, as here, a defendant initiates the discussion leading to the confession, it must also appear that the defendant intended to waive his right to counsel. *North Carolina v. Butler*, 441 U.S. 369, 60 L.Ed. 2d 286. Our further inquiry is thus whether the defendant, in addition to giving up the right to remain silent, knowingly, voluntarily, and intelligently waived the right to presence of counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L.Ed. 2d 405 (1983).

Defendant repeats his argument that his relinquishment of the right to presence of counsel was neither knowing, voluntary, nor intelligent. He stresses that the police withheld the information that his lawyer did not want defendant interrogated. We have already held that defendant effectively waived his right to remain silent. Applying the same standard here we also conclude under the totality of the circumstances that his waiver of the right to the presence of counsel was knowing, voluntary, and intelligent.

[10] The defendant's final argument regarding the admission of his statement into evidence is that his sixth amendment right to the assistance of counsel was violated. *United States v. Massiah*, 377 U.S. 201, 12 L.Ed. 2d 246 (1964). A defendant has a right to effective representation at all "critical stages" of a criminal prosecution. The State concedes that defendant's sixth amendment rights had attached but argues that defendant effectively waived those rights.

Defendant insists, however, that since he was not informed that his lawyer did not want him interrogated, his waiver of his sixth amendment rights was not intelligently made and was therefore invalid. Defendant argues that the information that his lawyer did not want him interrogated was necessary for an intelligent decision to waive his rights. We do not agree.

The standard for the validity of a sixth amendment waiver is that it be voluntarily, knowingly, and intelligently made. *Faretta*

*v. California*, 422 U.S. 806, 45 L.Ed. 2d 562 (1975); *Boyd v. Dutton*, 405 U.S. 1, 30 L.Ed. 2d 755 (1972); *see also Michigan v. Jackson*, 475 U.S. 625, 89 L.Ed. 2d 631 (1986). Having already held that the waiver was knowing, voluntary, and intelligent for the purposes of the fifth amendment, we also conclude that defendant made a valid waiver of his sixth amendment right to assistance of counsel.

[11] Defendant argues, however, that he *could not* waive his right to assistance of counsel under the circumstances of this case. His argument is that when an attorney represents a criminal defendant, he "speaks for" the defendant. Thus, he argues, by instructing the police not to question defendant further, the attorney was exercising defendant's sixth amendment rights for him. Defendant is urging this Court to adopt the rule set forth in *People v. Arthur*, 22 N.Y. 2d 325, 239 N.E. 2d 537 (1968) (once a lawyer represents a defendant in connection with criminal charges under investigation, the defendant may not waive his right to counsel in the absence of his lawyer). This Court has twice rejected this rule, *State v. Bauguss*, 310 N.C. 259, 311 S.E. 2d 248, *cert. denied*, 469 U.S. 838, 83 L.Ed. 2d 76 (1984); *State v. Smith*, 294 N.C. 365, 241 S.E. 2d 674 (1978), and we decline to adopt it now.

In *Bauguss*, the Court was faced with a situation similar to the case at hand. Defendant's attorney instructed the police not to question defendant on certain criminal charges. Defendant voluntarily confessed, and his confession was held admissible. In reaching this decision, this Court relied at least in part upon the fact that the attorney did not represent defendant on the charges under investigation. The Court said:

> We attach significance to the fact that Attorney Freeman represented the defendant in a matter unrelated to the Absher murder investigation. As the State points out, prior to defendant's inculpatory statements, defendant was not a suspect in the murder case, but was merely a witness cooperating with law enforcement officials in their investigation. We agree that if Attorney Freeman had represented the defendant on the murder and robbery charges, he could have controlled access to the defendant.

*Bauguss*, 310 N.C. at 266, 311 S.E. 2d at 252.

Here, defendant did ask for an attorney, and the attorney who asked that he not be questioned any further on the murder and robbery charges did represent him on those charges. However, the law in North Carolina is that the right to counsel belongs to the defendant, and he retains it even after counsel is appointed. *State v. Smith*, 294 N.C. 365, 241 S.E. 2d 674. Thus, the attorney may advise a defendant, but he cannot control defendant's own exercise of his constitutional rights. If defendant's waiver of his right to counsel is otherwise voluntary, knowing, and intelligent, his lawyer's wishes to the contrary are irrelevant. To the extent that the paragraph quoted from *Bauguss* suggests a different result, it is overruled. The federal constitution does not require a different result. *See Brewer v. Williams*, 430 U.S. 387, 51 L.Ed. 2d 424 (1977).

The totality of the circumstances here reveals both an uncoerced choice and the requisite level of comprehension. We therefore conclude that the defendant knowingly, voluntarily, and intelligently waived his fifth and sixth amendment rights. The trial court did not commit error when it permitted the State to introduce that confession into evidence.

[12] Defendant also argues that the trial court erred in allowing Police Chief Jerry Hathaway of Aulander to testify that he had seen defendant and Harmon near the Red Apple in Aulander sometime before midnight on the evening of 2 December 1983. Defendant argues that under the circumstances Hathaway described, he was unlikely to have seen defendant clearly enough to be able to identify him accurately and that the in-court identification was impermissibly tainted by an earlier identification at an unconstitutionally conducted "lineup" where defendant's lawyer was not present.

Assuming, *arguendo*, that defendant is correct, we conclude that any error in admitting Chief Hathaway's identification was rendered harmless by the subsequent admission of defendant's own statement. Defendant identified himself in his statement as the man who was with Harmon in Aulander that evening. We have previously held that this statement was properly admitted. Chief Hathaway's identification was thus merely duplicate information that was otherwise admissible. *See State v. Monk*, 291

N.C. 37, 229 S.E. 2d 163 (1976); *State v. Waters*, 308 N.C. 348, 302 S.E. 2d 188 (1983).

[13]    Defendant argues next that the trial court erred in allowing the introduction of black-and-white photographs and color slides that were "repetitious" and "gory" and which were used to inflame the jury.

The photographs about which the defendant complains were introduced to illustrate the testimony of SBI Agent Bryant, who testified as to the condition of the interior of the convenience store. The agent testified that the photographs fairly and accurately depicted the scene as he observed it at approximately 3:30 a.m. on 3 December 1984. The photographs were primarily used to illustrate his description of the store and his testimony concerning the location and size of various pools and trails of blood. These photographs were allowed into evidence for illustrative purposes over defendant's objection. The rule regarding the use of such photographs to illustrate the testimony of a witness is well stated in *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579 (1979):

> It is settled law that the unnecessary use of inflammatory photographs in excessive numbers solely for the purpose of arousing the passions of the jurors may deny defendant a fair and impartial trial. *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (1969); *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889 (1963). It is equally well settled that photographs are admissible to illustrate the testimony of a witness and their admission for that purpose under proper limiting instructions is not error. *State v. Crowder*, 285 N.C. 42, 203 S.E. 2d 38 (1974), *death sentence vacated*, 428 U.S. 903 (1976); *State v. Cutshall*, 278 N.C. 334, 180 S.E. 2d 745 (1971). *See generally* 1 Stansbury, N.C. Evidence § 34 (Brandis Rev. 1973). The fact that a photograph depicts a horrible, gruesome or revolting scene does not render it incompetent. When properly authenticated as a correct portrayal of what it purports to show, a photograph may be used by the witness to illustrate his testimony, and its admission for that purpose is not error. *State v. Duncan*, 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969).

*Sledge*, 297 N.C. at 231, 254 S.E. 2d at 582-83.

Applying these principles to the photographs in question, we conclude that they were properly admitted. Each was admitted to illustrate the witness' verbal descriptions of the scene and they were relevant to the State's attempt to prove the viciousness of the attack and the movement of the victim during and after the attack. They were not repetitious, as they depicted different scenes. Nor were they so gruesome and inflammatory that their value was outweighed by their prejudicial effect. The same is true of the several color slides used by Dr. Harris, the expert pathologist and medical examiner, to illustrate his testimony concerning the location, type, and size of the various wounds he observed on the victim. Such testimony, as illustrated by the slides used to illustrate it, was clearly relevant to the extent and nature of the wounds. The total number of photographs and slides admitted was not excessive, and the jury was properly instructed to consider them for the sole purpose of illustrating the testimony of the witnesses. *See State v. King*, 299 N.C. 707, 264 S.E. 2d 40 (1980). The trial judge did not err in admitting these photographs and slides.

Defendant complains of the admission into evidence of certain items of real evidence, such as the victim's false teeth, which bore scratch marks, on the basis that their admission had no purpose other than to inflame the jury. We have examined the record with respect to each item of which defendant complains and find this argument meritless.

Defendant also contends that the trial court erred in allowing the State to introduce certain items of real evidence without showing an adequate chain of custody. We have examined the testimony with respect to these items and find that the State established an adequate foundation for each one admitted into evidence.

[14] Defendant further contends that the trial judge erred in allowing the victim's daughter to testify as to her mother's normal activities. Defendant's main complaint is that the daughter was noticeably distraught during her testimony. This evidence, to the effect that the victim was sufficiently large and able-bodied to have struggled with a single assailant, was relevant and material to the State's contention that two people actively participated in the killing.

Defendant contends summarily that the trial court erred in allowing hearsay, leading questions on direct examination, and admission of inadmissible opinion testimony. Our examination of the record with respect to these assignments of error fails to disclose any error.

Finally, defendant makes a series of related arguments based on the sufficiency of the evidence to support his convictions. At the close of the State's case, defendant moved to dismiss the charge of first-degree murder. This motion was denied. Defendant argues that there was insufficient evidence to go to the jury on the issue of premeditated and deliberate murder. We agree.

The evidence before Judge Barefoot when he ruled on defendant's motion to dismiss was largely the defendant's own pretrial statement.[4] The statement was largely exculpatory, being inculpatory only to the extent that it placed defendant at the Red Apple, prepared to participate in the robbery. The defendant denied in his statement that he either participated in, intended, or contemplated the killing. The rest of the State's case was based upon the physical evidence of the killing: the condition of the body, the scene of the killing, and the testimony of witnesses placing defendant at the scene. The question before Judge Barefoot was whether this evidence was sufficient to go to the jury on the charge of premeditated and deliberate murder.[5]

In reviewing the sufficiency of the evidence needed to survive defendant's motion to dismiss, we are guided by several principles. The evidence is to be viewed in the light most favorable to the State. *State v. Thomas*, 296 N.C. 236, 250 S.E. 2d 204 (1978). All contradictions in the evidence are to be resolved in the State's favor. *State v. Brown*, 310 N.C. 563, 313 S.E. 2d 585 (1984). All reasonable inferences based upon the evidence are to be indulged in. *Id.* Our cases also establish that defendant's evidence

4. While the defendant did testify at a suppression hearing and at a later sentencing hearing, this testimony was not presented to the jury and did not, of course, figure into the judge's decision.

5. Defendant was eventually convicted of first-degree murder under both the theories of premeditation and deliberation and felony murder. Since the application of aggravating factors to murders depends in part on the theory under which the defendant was convicted, we must determine whether the evidence supports each of the two theories.

may be considered on a motion to dismiss where it clarifies and is not contradictory to the State's evidence or where it rebuts permissible inferences raised by the State's evidence and is not contradictory to it. *State v. Bates*, 309 N.C. 528, 308 S.E. 2d 528 (1983); *State v. Bruton*, 264 N.C. 488, 142 S.E. 2d 169 (1965). The same principle obtains where, as here, the defendant's statement is introduced by the State. *State v. Todd*, 222 N.C. 346, 23 S.E. 2d 47 (1942). Finally, while the State may base its case on circumstantial evidence requiring the jury to infer elements of the crime, that evidence must be real and substantial and not merely speculative. Substantial evidence is evidence from which a rational trier of fact could find the fact to be proved beyond a reasonable doubt. *State v. Pridgen*, 313 N.C. 80, 326 S.E. 2d 618 (1985); *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981). Evidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong. *State v. Malloy*, 309 N.C. 176, 305 S.E. 2d 718 (1983). When the evidence requires the jury to infer an element, that inference must be based upon direct evidence and not upon another inference. *State v. LeDuc*, 306 N.C. 62, 291 S.E. 2d 607 (1982); *State v. Parker*, 268 N.C. 258, 150 S.E. 2d 428 (1966).

In order for the jury to have properly concluded under the facts of this case that defendant was guilty of premeditated and deliberate murder, it must have determined beyond a reasonable doubt that the defendant himself inflicted deadly blows on the victim or that he participated in inflicting those blows or that he was ready and willing to help Harmon stab Mrs. Martin to death. *State v. Miller*, 315 N.C. 773, 340 S.E. 2d 290 (1986); *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741 (1985); *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980). The jury was instructed that if it found that defendant killed, or only helped Harmon kill, Mrs. Martin, it must find beyond a reasonable doubt that defendant himself premeditated and deliberated the killing before it could properly return a verdict of guilty on that theory. We hold that the evidence was insufficient for the jury to have reasonably concluded beyond a reasonable doubt that defendant participated in the actual killing or that he premeditated and deliberated the killing.

[15] While there was circumstantial evidence that might have created a suspicion—even a strong suspicion—that defendant probably participated in the stabbing, there was no direct evidence of defendant's participation in the stabbing; certainly

nothing to show that defendant himself stabbed Mrs. Martin. The defendant's statement was the only direct evidence on this point and was to the effect that defendant was outside in the car during the stabbings.[6] The State relied on circumstantial evidence to support its theory that the defendant was in the store and either stabbed Mrs. Martin or held her while she was being stabbed by Harmon. While the State is entitled to rely on circumstantial evidence to show either the *mens rea* or the *actus reus* of the crime, this evidence must be substantial and real, not speculative. *State v. Joplin*, 318 N.C. 126, 347 S.E. 2d 421 (1986); *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981); *State v. Alston*, 233 N.C. 341, 64 S.E. 2d 3 (1951). An examination of the evidence in the record before us convinces us that there was insufficient evidence from which a reasonable jury could determine beyond a reasonable doubt that defendant participated in the killing.

The State points to the circumstances surrounding the killing and argues that these circumstances compel the conclusion that two persons must have jointly killed Mrs. Martin. It argues that there were no "defensive" stab or cut wounds on the victim's arms, that the victim was a strong woman who could not have been subdued by Harmon alone, that there were marks on the victim's neck suggesting a choke hold, that there were two large pools of blood and large smears of blood on the floor suggesting a struggle, and that the victim indicated that there were two of them who did "it." The State also relied on the absence of any evidence by defendant to bolster its case. The prosecutor suggested in argument that the defendant had concealed evidence in the form of bloodied shoes and clothing. These items, argued the prosecutor, would have shown that defendant had actually perpetrated or participated in the stabbings.[7]

6. We note that the statement by defendant rebuts any inference raised by the State that defendant participated in Mrs. Martin's death. As such, this statement may be considered favorably to the defendant. *State v. Todd*, 222 N.C. 346, 23 S.E. 2d 47 (1942).

7. The State had SBI Agent Bryant testify that when he went to defendant's home on 5 December to get the sweatshirt worn by the defendant on the night of the crimes, the shirt was wet because it had been recently washed. The prosecutor argued that this showed attempts on the part of the defendant to conceal his guilt by destroying evidence. Moreover, the defendant testified at the suppression hearing that he did not know the current whereabouts of the shoes. The prosecutor argued that there was blood on the top of the shoes and that this would have in-

Even taking the evidence in the light most favorable to the State, we must conclude that it merely raised a suspicion that defendant stabbed Mrs. Martin or held her as she was being stabbed. A suspicion, even a strong suspicion, is insufficient to support a guilty verdict. *State v. Malloy*, 309 N.C. 176, 305 S.E. 2d 718. We note that the physical evidence could also be used to support a theory that no more than one person stabbed Mrs. Martin. Dr. Harris testified that the stab wounds were consistent with either one or two assailants. The fact that Mrs. Martin was apparently able to struggle effectively enough to get into several locations in the store suggests that she was not being restrained and thus there may have been only one assailant. While she did not have any stab or cut wounds on her arms, there was a bruised area on her left arm and a bruised and abraded area on her right index finger. These could have been injuries sustained in struggling against a single assailant. The marks on her neck may show that she was being held as she was being stabbed. However, it is just as likely that she was being held around the neck by one person who was stabbing her from behind, as that she was being held around the neck and having both arms restrained by one person while a second person was stabbing her. Finally, Mrs. Martin's indication that there were two of them who did "it" is ambiguous in this multiple-crime context.

It is not necessary, however, for defendant to have personally stabbed or held Mrs. Martin while she was being stabbed to be found guilty of premeditated and deliberate murder. One who is actually or constructively present, aids, abets, incites, or otherwise acts in concert with a perpetrator is held guilty as a principal as long as he has the requisite *mens rea*. *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated*, 408 U.S. 939, 33 L.Ed. 2d 761 (1972).[8] In this case, the

dicated that the defendant was either stabbing Mrs. Martin or holding her while she was being stabbed.

In addition, the prosecutor suggested in argument that the defendant had purposefully hidden the shoes to conceal his guilt.

8. We note that there is language in *Westbrook* suggesting that once a defendant participates in a felony, he is held responsible for all crimes arising out of that felony. *Westbrook*, 279 N.C. at 41-42, 181 S.E. 2d at 586. *Westbrook*, however, does not change the rule that, for crimes requiring a specific *mens rea*, that *mens rea* must be shown as to each defendant. Thus, here, as in *Westbrook*, defendant is

jury was instructed that it would find defendant guilty of premeditated and deliberate murder if it found that he acted in concert with Harmon to kill Mrs. Martin.

[16]　The State argued to the jury that the killing of Mrs. Martin was a part of a common scheme between defendant and Harmon. Thus, even though there was insufficient evidence to place defendant inside the store at the time of the killing, defendant could nonetheless be properly convicted of premeditated murder based on his admitted participation in the *robbery*. We agree that it would not be necessary for defendant to be actually present in order to be convicted of premeditated and deliberate murder under the acting in concert theory. *State v. Benton*, 276 N.C. 641, 174 S.E. 2d 793 (1970). However, the requisite *mens rea*—willfulness, premeditation, and deliberation—must still be shown. *State v. Joyner*, 297 N.C. 349, 255 S.E. 2d 390 (1979).

[17]　The State argued that premeditation and deliberation can be imputed to defendant from any of three sources. First, the number of wounds inflicted on Mrs. Martin could be the basis of premeditation and deliberation. We agree that the number of wounds can, under some circumstances, give rise to an inference of premeditation and deliberation. *State v. DeGregory*, 285 N.C. 122, 203 S.E. 2d 794 (1974). However, the number of wounds is not evidence of the *mens rea* of an accomplice who does not actively participate in the stabbings. It is a fundamental notion of criminal law that where a crime calls for a particular *mens rea*, it must be proved by the State beyond a reasonable doubt. *See* 1 W. LaFave & A. Scott, *Substantive Criminal Law*, § 3.4 (1986). The requisite *mens rea* for first-degree murder, except murders committed by certain enumerated methods, is willfulness, premeditation, and deliberation. N.C.G.S. § 14-17 (1986). While the felony murder rule allows the court to dispense with proof of premeditation and deliberation in order to convict, *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981), and while the number of wounds inflicted on the victim will support a jury's determination that a killing was premeditated and deliberate on the part of the killer, *State v. DeGregory*, 285 N.C. 122, 203 S.E. 2d 794, neither of

guilty of felony murder, a crime not requiring specific intent. However, neither Mr. Westbrook nor defendant here was shown to have the specific intent necessary to convict a person of premeditated and deliberate murder.

these principles allows us to impute premeditation and delibera-
tion from the person inflicting the wounds to one who is only held
culpable for the murder by reason of his participation in the un-
derlying felony.

[18]   The State's second argument as to defendant's mental state
was that both men intended from the start to kill Mrs. Martin as
a potential witness. The jury was asked to believe that the de-
fendant and Harmon were both known to Mrs. Martin, that they
took no precautions against being identified, and that they
therefore intended from the start to kill Mrs. Martin as a poten-
tial identifying witness. This conclusion, however, is speculative
"inference stacking." The first inference is that the two men did
not conceal their identity. There was no direct evidence on this
point in the guilt-innocence phase of defendant's trial.[9] Rather,
defendant's statement to Deputy Wheeler that he was concerned
about being identified and his failure to say that he was masked
could have led the jury to infer that he and Harmon went into the
store unmasked. Having inferred that the men went into the
store unmasked, the jury may have inferred their intent to kill
Mrs. Martin. While this latter inference would have been per-
missible if there was direct evidence that the two men made no
efforts to hide their identity, it was impermissible where the only
suggestion that they were unmasked was itself an inference from
the silence of the record.

[19]   Third, the State argues that the evidence shows that Reese
knew that Harmon intended to kill Mrs. Martin, and therefore
premeditation and deliberation can be imputed to him.

There are circumstances under which a defendant may be
held responsible for a murder committed entirely by another and
neither intended, premeditated, nor deliberated by the defendant.
Thus, under the felony murder rule, when two people act in con-
cert to commit a robbery, each person is responsible not only for
that crime, but for a murder committed during the course of the

---

9. In the sentencing hearing, the defendant did provide some direct evidence
on the question of masks. When asked if Harmon was unmasked, the defendant said
"Yes." Defendant was then asked if he himself was not unmasked when he went
into the store. The defendant gave an ambiguous reply, to the effect that he would
not have been recognized because Mrs. Martin was to be on the floor behind a
counter.

robbery. *State v. Maynard,* 247 N.C. 462, 101 S.E. 2d 340 (1958); *see also State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572. Since the evidence in this case was that the defendant planned and participated with Harmon in the robbery of Mrs. Martin, defendant is responsible for the killing under the felony murder rule, even if the killing was entirely Harmon's deed. However, this evidence does not bear on the question of whether defendant committed *premeditated* and *deliberate* murder.

We have already held that the evidence was insufficient to support a finding that the defendant participated in the actual killing or intended that a killing take place. We now also conclude that the evidence only allowed a speculation that the defendant knew that Harmon intended the killing. The State argued that defendant must have known of Harmon's intentions. The prosecutor suggested that since the two had spent the entire evening together, they must have worked out a detailed plan for committing the crime, including how to dispose of witnesses. Moreover, since Harmon was unmasked, defendant must have known that Harmon would kill Mrs. Martin. There are obvious flaws in this reasoning. First, there was no evidence that defendant discussed anything other than the robbery with Harmon. Second, there was no evidence presented in the guilt-innocence phase of the trial that Harmon was not masked when Harmon went into the Red Apple. Third, there was no evidence presented in the guilt-innocence phase of the trial that *Harmon* knew Mrs. Martin or that defendant knew that Harmon knew Mrs. Martin.[10] In short, there is nothing in the evidence to suggest that defendant knew that Harmon intended to kill Mrs. Martin.

We hold that there was insufficient evidence from which a reasonable jury could find beyond a reasonable doubt that defendant, acting alone or in concert with Harmon, committed premeditated and deliberate murder.

___

10. At the sentencing hearing, there was evidence that Harmon was not masked. Moreover, defendant testified that Harmon said that Harmon had killed the woman because she had recognized him. However, there was no evidence that defendant knew before the killing that Harmon would be recognized by the victim. Defendant testified that he thought Harmon would not have robbed the store if he would be recognized. None of this evidence was before the judge at the close of the State's case in the guilt-innocence phase.

[20]  Nothing we have said affects the defendant's accountability, under the felony murder rule, for his participation in these crimes. Because defendant was found guilty on both the theories of premeditation and deliberation *and* felony murder, he is not entitled to a new trial on the murder charge.

A defendant may properly be found guilty of first-degree felony murder where he knowingly engages in the commission of a dangerous felony and where a killing takes place. *State v. Peplinski*, 290 N.C. 236, 225 S.E. 2d 568, *cert. denied*, 429 U.S. 932, 50 L.Ed. 2d 301 (1976). Here, there was ample evidence that defendant planned to rob the Red Apple and that he was at least constructively present and available to assist Harmon. Whether there was insufficient evidence to show that defendant either committed the killing himself, intended that the killing take place, or even knew that the killing would take place is irrelevant for the purpose of determining defendant's guilt under the felony murder theory. *State v. Shrader*, 290 N.C. 253, 225 S.E. 2d 522 (1976).

## Sentencing Phase

Defendant makes several arguments directed to the constitutionality of the capital sentencing statute, as written and/or as applied to the defendant. Each of these arguments has been addressed several times by this Court. *See, e.g., State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983). We find nothing in defendant's arguments to persuade us that the statute is unconstitutional.

Defendant next argues that the trial judge erred in submitting three aggravating factors to the jury: (1) that the murder was committed during the commission of an armed robbery; (2) that the murder was committed in order to avoid a lawful arrest; and (3) that the murder was especially heinous, atrocious, or cruel.

[21]  Defendant first contends that the submission of the aggravating factor that the killing was committed during an armed robbery was erroneous. N.C.G.S. § 15A-2000(e)(5) (1983). We agree. This factor would have been a proper aggravating factor if the theory of premeditation and deliberation had been properly

before the jury. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 177 (1983). However, because we have held that the defendant was not properly convicted of premeditated and deliberate murder, we must consider this factor in that light.

We have held that where the underlying felony in a felony murder conviction is armed robbery, the fact that the murder occurred during the course of that robbery may not also be used as a factor in aggravation. *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551, *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1979). Here, the defendant was properly convicted only on the theory of felony murder. It follows, therefore, that the jury should not have considered this aggravating factor in making its sentencing recommendation. Defendant is therefore entitled to a new sentencing hearing without the submission of this aggravating factor. *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689 (1983).

[22] Second, the prosecutor argued at sentencing that the killing was committed to avoid a lawful arrest. N.C.G.S. § 15A-2000(e)(4) (1983). Defendant contends that this was also error. Again, we agree. While this may be a proper aggravating factor where there is competent evidence that the killing was committed for this purpose, it must be supported by evidence to that effect. Here, the only evidence relied upon to support this factor was the killing itself. *See State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981). This factor may not be submitted to the jury on resentencing without evidence other than the killing itself that the murder was committed for the purpose of avoiding a lawful arrest.

[23] Finally, the defendant argues that it was error for the trial judge to have submitted to the jury the aggravating factor that the killing was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (1983). Here, we disagree. We have repeatedly held, in factual situations comparable to the one *sub judice*, that this factor is properly submitted where there is evidence that the killing involved a prolonged death or was committed in a fashion beyond that necessary to effect death. *See, e.g., State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). Here, there was

plenary evidence that Mrs. Martin struggled violently against death. Dr. Harris testified that she was stabbed repeatedly, as if in a "frenzy." There was also evidence that Mrs. Martin remained conscious for many minutes before dying.

[24] Defendant argues that, regardless of any aggravating factors, he could not be sentenced to death for his participation in the crimes committed at the Red Apple, consistent with the eighth amendment to the United States Constitution prohibiting cruel and unusual punishment. Since we have found error in the sentencing phase of the trial and since defendant must therefore be resentenced, we need not reach this issue. However, we note a possible error in the instructions given the jury in the trial of this case, and invoking our supervisory power over the trial courts and Rule 2 of the North Carolina Rules of Appellate Procedure, we direct the trial court to refrain from repeating this instruction on resentencing.

In *Enmund v. Florida*, 458 U.S. 782, 73 L.Ed. 2d 1140 (1982), the United States Supreme Court, in construing and applying the eighth amendment, held that, before he may be sentenced to death, a participant must have killed or attempted to kill or intended or contemplated that life would be taken.

Our cases decided after *Enmund* have reflected that holding:

Therefore, in instant case, at the new sentencing hearing and before the sentencing jury begins its consideration of aggravating and mitigating circumstances toward returning its recommendation as to punishment, the trial judge should submit to and the jury answer issues as follows:

1. Did defendant deliver the fatal blows which caused the victim's death?

2. If not, did defendant, while acting as an aider and abettor, attempt to kill, intend to kill, or contemplate that life would be taken during their commission of the felony?

*State v. Stokes*, 308 N.C. 634, 651, 304 S.E. 2d 184, 195 (1983).

Later cases from the United States Supreme Court have suggested that the *Enmund* requirement is met if the defendant in-

tended or contemplated that lethal force would be used if it became necessary to effectuate the crime:

> *Enmund* . . . imposes a categorical rule: a person who has not in fact killed, attempted to kill, or *intended* that a killing take place or that *lethal force be used* may not be sentenced to death.

*Cabana v. Bullock*, 474 U.S. 376, 386, 88 L.Ed. 2d 704, 716 (1986) (emphasis added); *see also Tison v. Arizona*, 142 Ariz. 454, 690 P. 2d 755 (1984), *cert. granted*, 475 U.S. 1010, 89 L.Ed. 2d 299 (1986).

In the case at bar, the trial judge gave the "*Enmund*" Pattern Jury Instruction, following N.C.P.I. § 150.10:

> So I charge that for you to recommend that the defendant be sentenced to death, the State must prove . . .:

> First, that Michael Reese himself either

> (a) Killed or attempted to kill Martha Martin, or participated in the killing with others; or

> (b) Intended that Martha Martha [sic] be killed in the course of robbery with a deadly weapon; or

> (c) Contemplated that deadly force *might* be used in the course of robbery with a deadly weapon.

(Emphasis added.)[11]

---

11. The drafters of the Pattern Jury Instructions apparently derived the phrase "contemplated that deadly force might be used" from the following language in *Enmund*:

> It was thus irrelevant to Enmund's challenge to the death sentence that he did not himself kill and was not present at the killings; also beside the point was whether he intended that the Kerseys be killed or anticipated that lethal force *would or might be used* if necessary to effectuate the robbery or a safe escape.

*Enmund*, 458 U.S. at 788, 73 L.Ed. 2d at 1146 (emphasis added). As is obvious from our quotation of *Enmund*, the "or might" language was not included in the actual holding of the case.

As later United States Supreme Court cases make clear, however, the minimum *mens rea* for the death penalty in this context is intention or contemplation that deadly force will be used if necessary to effectuate the crime. *See Cabana v. Bullock*, 474 U.S. 376, 88 L.Ed. 2d 704.

We note that this instruction did not require the jury to find that defendant either intended or contemplated that deadly force *would* be used against Mrs. Martin, only that it *might* be used. On resentencing, the word "might" shall be omitted from the instruction and the word "would" substituted therefor in paragraph (c) of the Pattern Jury Instructions.

Defendant argues finally that the sentence imposed was disproportionate to the crime he committed. Since we have found error in the sentencing phase of the trial, this issue is not properly before us and therefore need not be addressed. *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 U.S. 1117, 70 L.Ed. 2d 655 (1981).

For the reasons stated above, we find no error in defendant's conviction for murder on the theory of felony murder or in his conviction and sentencing for felonious conspiracy. For error in the sentencing phase on the murder conviction, we vacate the sentence of death and remand the case for resentencing for first-degree felony murder.

Case No. 83CRS187—Felonious conspiracy—no error.

Case No. 82CRS4976—First-degree murder—no error in the guilt phase; sentence vacated; remanded for new sentencing hearing for first-degree murder.

Justice MITCHELL dissenting.

I believe that the evidence was sufficient to support the defendant's conviction for first-degree murder on the theory of premeditation and deliberation as well as on the felony murder theory and that the sentence of death was properly entered. I would find no error in either the guilt or sentencing phases of the defendant's trial and would proceed to the proportionality review required of this Court in capital cases. Therefore, I dissent.

When viewed in the light most favorable to the State, as it must be on the defendant's motion to dismiss, the evidence here was sufficient to support a reasonable finding by the jury that the defendant participated in the killing of the victim and did so in a premeditated and deliberate manner. The victim unequivocally indicated to law enforcement officers that two people had done "it."

The jury quite reasonably could have found that the "it" the victim referred to was the stabbing and her imminent death, not a few dollars being taken from the store. Indeed, if the defendant's statement is believed, it is questionable whether the victim ever knew that anything had been taken from the store. According to the defendant's version of the events, he did not take anything from the store until the victim had been stabbed several times and lay helpless on the floor.

The victim's statement must be viewed in light of the physical evidence that she had been stabbed numerous times but that there were no stab wounds to her hands or arms to suggest she had been able to raise them to shield herself. Additionally, marks on her neck indicated that she had been severely strangled.

In my view, the victim's statement is direct evidence that two people inflicted the wounds which caused her death. The defendant's own statement supports a finding that he and his accomplice were those two people. The physical evidence supports a reasonable finding that the defendant either stabbed the victim himself or strangled her while his accomplice stabbed her. Evidence that the defendant knew before he entered the store that the victim could identify him and his efforts after the crime to conceal evidence also support a reasonable finding that he knew at the time he entered the store he would take the victim's life. Therefore, the evidence was sufficient to take the charge against the defendant to the jury on the theory of premeditated and deliberate murder.

Since I believe that the defendant's conviction on the theory of premeditated and deliberate murder was proper, I also must reject the majority's view that the jury could not consider the fact that the murder occurred during an armed robbery as an aggravating factor for sentencing. The majority's holding in this regard is based entirely upon its conclusion — erroneous I think — that the murder charge could only be submitted on a felony murder theory, and that the underlying felony of armed robbery could not be considered as aggravating. Again, I do not agree.

Finally, I reject the majority's view that there was no competent evidence to support the aggravating factor that the killing in this case was committed to avoid a lawful arrest. The majority is in error when it states that the only evidence relied upon to sup-

port this factor was the killing itself. The evidence showed that the defendant was well acquainted with the victim of the murder and knew that she would be working at the store on the evening in question. The defendant was concerned specifically about the fact that the victim would be able to identify him. The finding of the jury in the present case that the defendant engaged in the murder to prevent detection and lawful arrest was reasonable in light of the evidence that, despite his concern that the victim would identify him, the defendant went ahead and participated in the robbery and killing. Such evidence was sufficient to support a reasonable finding that prior to the robbery and killing the defendant had formed the intent to kill the victim in part at least to avoid detection and arrest.

This case is easily distinguishable from *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), relied upon by the majority, wherein the only evidence of this aggravating factor was the defendant's general expression, after the crime had been completed, indicating that he did not want to be apprehended. I do not believe that *Williams* is any authority for the holding of the majority that this aggravating factor was improperly submitted and found in the present case.

As I find no error in either the trial or sentencing of the defendant, I would so hold and proceed to address the question of whether the sentence of death is disproportionate in the present case. Since the majority holds that the case must be remanded for errors committed during the trial and sentencing phases, however, it would serve no useful purpose for me to discuss the proportionality issue here.

I respectfully dissent.

Justice MARTIN joins in this dissenting opinion.