STEPHENS, Judge, dissenting.
Applying our well-established standard of review to the trial court's denial of defendant's motion to dismiss, I conclude that the State offered sufficient evidence of defendant's failure to properly supervise Mercadiez to submit the case to the jury. Further, I would find no error in the admission of Rule 404(b) evidence or in the trial court's failure to intervene ex mero motu in the State's closing argument. For the reasons discussed below, I would hold that defendant received a trial free from error. Accordingly, I respectfully dissent.
I. Relationship between the State's and the defense's evidence on supervision
I agree with the majority opinion that, in ruling on a defendant's motion to dismiss, the "defendant's evidence may be considered on a motion to dismiss where it clarifies and is not contradictory to the State's evidence or where it rebuts permissible inferences raised by the State's evidence and is not contradictory to it ." State v. Reese , 319 N.C. 110, 138-39, 353 S.E.2d 352, 368 (1987) (citations omitted; emphasis added), overruled on other grounds by State v. Barnes , 345 N.C. 184, 481 S.E.2d 44 (1997) ; see also *721 State v. Barnett , 141 N.C.App. 378, 382-83, 540 S.E.2d 423, 427 (2000) (holding that "the trial court is not to consider [a] defendant's evidence rebutting the inference of guilt except to the extent that it explains, clarifies or is not inconsistent with the State's evidence") (citation and internal quotation marks omitted), affirmed per curiam , 354 N.C. 350, 554 S.E.2d 644 (2001). I reach a different result from the majority because, in my view, defendant's evidence regarding *145 the events immediately before Mercadiez drowned was contradictory to the State's evidence on the same point.
The majority opinion notes that, "[w]hile the State's case did not emphasize the fact that Mr. Reed was also home with defendant at the time of Mercadiez's drowning, the evidence the State offered did indicate that he was at the house during the relevant period of time." I fully agree.[9] The uncontradicted evidence was that Mr. Reed was in the home at the time of Mercadiez's drowning, just as the uncontradicted evidence was that defendant herself was also in the home at the time. The critical issue regarding defendant's criminal responsibility for the death of her daughter, however, is not what adults were in the home at the time Mercadiez found her way into the pool, but rather, what adult, if any, was supervising Mercadiez. On that critical issue, the State's evidence showed that defendant left her 19-month-old baby in the care of nine-year-old Sarah. I simply do not agree with the majority's assertion that the acknowledged presence of Mr. Reed somewhere inside a multi-room house, without any evidence that he could hear or see Mercadiez as she played outside on the side porch with other children, was in any way relevant to the question of who was supervising Mercadiez when she wandered away to her death. The majority further contends that Mr. Reed's testimony for the defense-that he was in the living room when defendant went to the bathroom and that defendant specifically asked him to supervise Mercadiez -was not inconsistent with, and merely clarified, the State's evidence. A careful reading of the trial transcript belies this characterization of the evidence presented by the State and the defense.
The only evidence offered by the State about what happened in the minutes leading up to the drowning came from Sergeant Michael Kellum of the Jacksonville Police Department ("JPD"). After testifying in detail about the Reeds' home and its appearance after Mercadiez's death, Kellum briefly discussed the interview he conducted with defendant.
Q Did you ask [defendant] to explain to you what she had been doing in the moments leading up to this incident?
A Yes, sir.
*146 Q What did she tell you?
A That she was in the bathroom.
Q Did she tell you how long she had been in the bathroom?
A Yes. She estimated, I believe, it was five to ten minutes.
[discussion of which bathroom defendant used ]
Q What happened then, or what did she explain to you happened then?
A She said that she came out of the bathroom and she saw the oldest daughter, or the older daughter, playing in that-or in the house, and she had earlier seen the infant, Mercadiez, with-playing with the older daughter. So she asked the older daughter where Mercadiez was, and she-the daughter indicated that she had brought her inside and put her inside the living room, earlier. And she-according to her interview, she immediately started looking for the child, inside the house, going room to room, trying to find the house-or trying to find the child, and then went out the front door and around the house, trying to find the child, until she went out the master bedroom door overlooking the pool, and saw the baby floating in the pool.
[discussion of how Mercadiez was retrieved from the pool and 911 was called ]
*722 Q You said she indicated that she had been in the bathroom for five to ten minutes.
A Yes, sir.
Q Did you ask her about that?
A No. She provided that, previously. During the interview, she had provided that she had begun menstruating and was-that's why she was in the bathroom.
[discussion of the time defendant spent in the bathroom ]
Q Okay. And I guess she acknowledged to you that Mercadiez was not with her, at that time?
A That's correct.
Q And based on what [defendant]-did [defendant] explain to you where Mercadiez was, at that time?
*147 A She had-when she went into the bathroom, she had seen Mercadiez playing on the side concrete porch by the side door, with the other girls, that being [Sarah] and [Sarah's] friends from down the street.
Q And those are minors,[10] as well, right?
A Yes, sir.
Q Did she acknowledge to you that [Sarah] told her when she brought Mercadiez back into the house?
A She-once she came out of the bathroom and asked [Sarah] what-she saw [Sarah] without Mercadiez, asked [Sarah] where Mercadiez was. [Sarah] said she had put her in the living room.
In sum, on direct examination, the State's evidence was that: (1) Mercadiez was playing outside with Sarah and other children when (2) defendant went to the bathroom where (3) she remained for five to ten minutes because she was menstruating and, when she came out of the bathroom, (4) defendant encountered Sarah inside the house without Mercadiez and (5) asked Sarah where her youngest sister was.[11] Kellum did not offer any testimony about what Mr. Reed was doing, where he was in the house, or whether defendant asked him to watch Mercadiez when she went to the bathroom.
On cross-examination of Kellum, defendant had the opportunity to clarify the critical question of what happened in the moments before defendant went to the bathroom. However, defendant's trial counsel did not ask Kellum whether defendant mentioned asking her husband to watch Mercadiez when she went to the bathroom nor did he ask *148 whether Mr. Reed mentioned being asked to watch Mercadiez during Mr. Reed's interview with Kellum. Defendant's trial counsel did not even ask whether Mr. Reed or defendant had mentioned Mr. Reed's presence in the living room at the time defendant went to the bathroom.[12] Indeed, the only questions *723 defense counsel asked about Kellum's interviews with defendant and Mr. Reed sought to clarify how Mercadiez got outside onto the side porch:
*149 Q Well, as you remember this interview, did [defendant and Mr. Reed] tell you the same thing about what happened that day?
A Yes, sir.
[discussion of when the interviews took place ]
Q And in response to some of [the prosecutor's] questions, you indicated that their belief was that the child went from the side porch, through the locked gate.
A Yes, sir.
Q And that the child had been out there with her older sister, [Sarah].
A Yes, sir.
[discussion of the ages of the other children in the home that day ]
Q Okay. Do you remember how they told you Mercadiez got outside?
A That she had-[Sarah] was playing with them and had taken her outside, I believe.
[discussion of the layout of the Reeds' home ]
Q During your interview with Mr. Reed, you discussed how Mercadiez got outside.
A We discussed the movements of the family that day, yes, sir.
Q Okay. And per your recollection, what did he tell you about that?
[THE STATE]: Objection.
THE COURT: Sustained.
Q You talked to [defendant] about it.
A About the movements of the children during the day? Yes, sir.
Q Did she give you any indication of how the child got outside?
*150 A No, sir, not that I recall. The children were in and out, playing, all during the day....
I am not, as the majority opinion suggests, "arguing that defense counsel was required to cross-examine ... Kellum about Mr. Reed's role in these events." (Emphasis added). I am simply observing that the State presented its version of the events leading up to Mercadiez's drowning, and I fully agree with the majority's observation that, in doing so, "the State chose to rely solely upon ... Kellum and not to call Mr. Reed as a witness." Defendant had no duty whatsoever to cross-examine Kellum on any point unless she wished to elicit evidence contradictory to the State's version of how Mercadiez came to be unsupervised and find her way tragically into the backyard pool. To recap, the State's evidence about the critical minutes before the drowning was that defendant reported leaving Mercadiez outside on the side porch with Mercadiez's nine-year-old sister, Sarah, while defendant went to the bathroom for five to ten minutes. In addition, Kellum testified that defendant told him she realized Mercadiez was missing when she saw Sarah inside without the toddler and that defendant immediately asked Sarah where Mercadiez was. According to Kellum's account of the interview, defendant did not mention asking Mr. Reed to watch Mercadiez, seeing Mr. Reed when she left the bathroom, or asking Mr. Reed where Mercadiez was, as might be expected if defendant had left Mercadiez in Mr. Reed's care. Therefore, I reject defendant's argument that the State offered no evidence of a lack of supervision by defendant.
Mr. Reed was the only witness to testify for the defense, and, as noted supra , his *724 testimony "may be considered ... [only] where it clarifies and is not contradictory to the State's evidence or where it rebuts permissible inferences raised by the State's evidence and is not contradictory to it ." See Reese , 319 N.C. at 139, 353 S.E.2d at 368 (citations omitted; emphasis added). Mr. Reed's account of the events during the critical time period was as follows:
A ... I went back over here and continuously, you know, helped her with the laundry, and then I went out and sat down on the-once the laundry was done, I sat on the couch-well, when she was finishing up, I sat on the couch.
....
Q From there, you could see out the door [onto the side porch]?
*151 A From there, you can see out the door.
Q Did you see Mercadiez?
A Yes.
Q You had your eye on her from sitting right there?
A Yep.
Q And after you sat down, tell me what happened from there.
A I sat down from there, and that's when [defendant] said, you know, I have to use the bathroom, you got this? And I said, yes.
Q You got this?
A You got this.
Q What does that mean?
A To me, it means you got what's going on in the house, everything that's going on.
Q Referring to the children?
A Referring to the children, whatever.
Q And [defendant] left?
A To go use the bathroom, yes.
[discussion of which bathroom defendant was using ]
Q Tell me what happened, from there.
A Like anything, I was sitting there. I said, yes. She left to go to the bathroom. I was sitting-not even a couple minutes later, I mean, I heard-
[discussion of why defendant was going to the bathroom ]
Q And I'm sorry, I just wanted-if you will, so she goes to the bathroom.
A Right. While she was in the bathroom, like anything, and then I was sitting over here, and Mercadiez is up front in the yard with-the side porch with [Sarah], I heard, "Can't I [use the bathroom] in peace?"
*152 Q And that was [defendant]?
A That was [defendant], yes.
Q What was that about?
A While she was in the bathroom, the two younger [children were] in there, bothering her. And from there, like anything, I mean, just when I heard that, I got up. When I was walking by, walking by this area right here, I got up, walked around, was walking right through here, that's when I looked over to the front door, which is this way, and I saw Mercadiez sitting down on the porch with [Sarah], playing in the flower-the flower pot that was in the picture, she was playing in the flower pot.
Q Where did you go from there?
A I went into the-the bathroom where she was located, where [defendant] was located, and grabbed the two girls from there.
[discussion of which two girls were bothering defendant ]
Q And at that point, [defendant] was sitting on the toilet?
A Yes, she was sitting on the toilet.
Q And what did you do with those two little girls?
[discussion of Mr. Reed setting up a movie for the two girls ]
A I checked on [another child], and then I walked back up through the hallway. When I was walking up through the hallway, [defendant] got done using the bathroom and came out.
Q So you essentially met her in the hallway?
A Met her in the hallway, yes.
Q She's in front of you. Which way did she go?
A She went through the-through the hallway, into the kitchen.
*725 [discussion of how close defendant and Mr. Reed were in the hallway ]
*153 A When I got into the kitchen, like anything, well, she walked up, and she walked towards the middle of the counter right there, by the middle of the counter, and then [Sarah] walked in. And when [Sarah] walked in, the first thing [defendant] said is, "where is Mercadiez?"
Thus, Mr. Reed's account was that (1) he was with defendant in the living room already supervising Mercadiez when defendant announced that she was going to the bathroom and asked Mr. Reed to watch the toddler; (2) he heard defendant call out in frustration because two other children were in the bathroom bothering her; (3) he left the living room for several minutes to settle the other children in front of a movie; and (4) he met defendant in the hallway as she left the bathroom.[13] Mr. Reed's version of events is plainly not consistent with the State's evidence that defendant left Mercadiez outside on the side porch with Sarah while defendant went to the bathroom for five to ten minutes and that, when defendant returned to the living room, she was surprised to encounter Sarah inside without Mercadiez. Accordingly, in considering the merits of defendant's motion to dismiss for insufficiency of the evidence, neither the trial court nor this Court should consider Mr. Reed's testimony regarding the events immediately preceding the drowning.
I find State v. Bates , 309 N.C. 528, 308 S.E.2d 258 (1983), the primary case relied upon in the majority opinion, easily distinguishable. The defendant in Bates , having been convicted of felony murder and robbery with a dangerous weapon as a result of an admitted altercation with another man, argued on appeal that "the trial court erred in denying his motion to dismiss the armed robbery charge[, which was also the predicate felony supporting his felony murder conviction] for insufficiency of the evidence." Id. at 533, 308 S.E.2d at 262. "Specifically, [the] defendant argue[d] that the State ha[d] not shown by substantial evidence a taking of the victim's property with the intent to permanently deprive him of its use." Id. at 534, 308 S.E.2d at 262. As noted in the majority opinion, the State's evidence concerned the scene of the crime, including the condition of the victim's and the defendant's bodies, and the location of the victim's and the defendant's personal possessions. Id. at 534-35, 308 S.E.2d at 262-63. There were no witnesses to the fight, but the defendant testified about the events which led up to the altercation and his account of how the victim was killed.
*154 Id. at 535, 308 S.E.2d at 263. Importantly, both the "[d]efendant's testimony and the physical evidence reveal[ed] that a brutal fight took place between" the defendant and victim. Id. On the only point of dispute-whether the defendant had robbed the victim-"[t]he State relie[d solely] on the fact that the deceased's property was found some distance from his body to establish a taking by [the] defendant[,]" while the "[d]efendant testified that he never saw [the victim's] possessions nor was he aware of how they came to be strewn around the area." Id. at 534, 535, 308 S.E.2d at 262, 263. Our Supreme Court, in holding the evidence was insufficient to survive the defendant's motion to dismiss, observed that, "[w]hen [the] defendant's explanatory testimony is considered along with the physical evidence presented by the State, the logical inference is that the [victim] lost these items of personal property during the struggle with [the] defendant." Id. at 535, 308 S.E.2d at 263. In other words, there were not two possible accounts of the crime presented. Instead, the State's evidence was entirely a description of the physical crime scene-the "what" of the altercation-while the defendant's evidence concerned the "how" and "why" of the fight. The State's evidence would have supported an inference of robbery, but the defendant's evidence provided an explanation that rebutted the inference of robbery by permitting an innocent inference from the State's crime scene evidence.
Here, in contrast, the State and defendant each presented a distinct "story" of how Mercadiez came to be unsupervised such that she could wander away and drown. The State's *726 evidence was that defendant was watching Mercadiez play outside on the side porch with her sister when defendant left the living room and spent several minutes in the bathroom where she could not supervise Mercadiez and that the toddler was not with her older sister when defendant returned from the bathroom. Defendant's evidence was that her husband was already watching Mercadiez when defendant asked him to supervise the toddler while she went to the bathroom for several minutes only to find Mercadiez missing when defendant and her husband both returned to the living room.[14] Unlike in Bates , the question here is not whether an inference permitted by the State's evidence is rebutted by the clarifying evidence of the defendant which supports a more likely inference. It is whether the jury believed the State's theory of the case, to wit, that defendant left Mercadiez unsupervised when she went to the bathroom, or whether they believed defendant's account that she left her child in the care of *155 her husband. Simply put, both versions of the moments before the tragic drowning cannot be true. Thus, the State's evidence is inconsistent with defendant's evidence and could not be considered by the trial court or by this Court in evaluating the sufficiency of the evidence against defendant. See Reese , 319 N.C. at 139, 353 S.E.2d at 368 (stating that a defendant's evidence "may be considered ... [only] where it clarifies and is not contradictory to the State's evidence or where it rebuts permissible inferences raised by the State's evidence and is not contradictory to it " (citations omitted; emphasis added)). However, in order to fully address defendant's argument that the trial court erred in denying her motion to dismiss, her contentions that the trial court erred in admitting certain Rule 404(b) evidence must also be considered.
II. Admission of Rule 404(b) evidence
I agree with the ultimate determination in the majority opinion that the trial court did not err in admitting, pursuant to Rules 403 and 404(b) of the North Carolina Rules of Evidence, evidence regarding the previous drowning of another toddler left in defendant's care. However, because a more thorough discussion of the evidence and the basis for its admission is helpful in understanding why (1) defendant's motion to dismiss was properly denied and (2) the trial court did not err in failing to intervene ex mero motu in the State's closing argument, I write separately on this issue.
As noted by the majority, during the investigation of Mercadiez's death, JPD officers learned about the 22 September 2010 death of 19-month-old Sadie Gates, who had wandered away and drowned in a rain-filled creek while in defendant's care. Defendant was convicted of involuntary manslaughter in connection with that incident and was still on probation at the time of Mercadiez's death. In addition, investigators received a report from a neighbor of the Reeds regarding an incident that occurred about a month before Mercadiez's death. The neighbor had been driving past the Reeds' home and noticed two children, one a toddler and the other about three or four years old, playing at the edge of the curb next to the street. Concerned for the children's safety, the neighbor stopped her car and knocked on defendant's door, which was answered by a five- or six-year-old child. When defendant eventually came to the door, the neighbor pointed out the unsupervised young children in the yard, and defendant went to retrieve them.
In June 2014, the State filed a motion in limine regarding the admissibility of the neighbor's report of unsupervised young children in defendant's yard and the 2010 drowning of Sadie Gates. In July 2014, *156 defendant filed her own motion in limine , arguing that the admission of evidence of those events was barred by Rule 404(b). Following a hearing, on 23 September 2014, the trial court entered an order denying defendant's motion in limine to exclude evidence of the 2010 drowning. The court deferred ruling on the admissibility of the neighbor's testimony until trial, ultimately allowing the neighbor to testify about the unsupervised children seen in defendant's *727 yard about a month before Mercadiez drowned.
On appeal, defendant argues that the trial court erred in admitting testimony under Rules 403 and 404(b) about the 2010 drowning of Sadie Gates.[15] I disagree.
As our Supreme Court has observed:
When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)....
Rule 404(b) is a clear general rule of inclusion . The rule lists numerous purposes for which evidence of prior acts may be admitted, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident. This list is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime....
Though it is a rule of inclusion, Rule 404(b) is still constrained by the requirements of similarity and temporal proximity. Prior acts are sufficiently similar if there are some unusual facts present in both crimes that would indicate that the same person committed them. We do not *157 require that the similarities rise to the level of the unique and bizarre.
State v. Beckelheimer , 366 N.C. 127, 130-31, 726 S.E.2d 156, 159 (2012) (citations and internal quotation marks omitted; italics added; emphasis in original).
Here, the trial court summarized the similarities between the 2010 and 2013 drownings in its seven-page order as follows:
There are sufficient similarities between the two events to support the [S]tate's contention that the former incident is evidence that shows (1) knowledge on the part of [defendant] of the dangers and possible consequences of failing to supervise a young child who has access to or is exposed to bodies of water; (2) absence of accident; and (3) explains the context of her statements at the scene and later to law enforcement.
Both events arose out of the supervision of children who were nineteen months old. [Defendant] was babysitting Sadie Gates who had been left with [defendant] on September 22, 2010 by her mother. A creek which had become swollen due to rainfall was located within 25 yards of [defendant's] home. In places the water was five feet deep. Any barrier to keep the child away from this hazard had become ineffective. The property did not have a fence between the house and the creek. At the probable time of the incident [defendant] was engaged in caring for another child or watching a television program with her estranged husband who was in the home. The time period that the child was not being attended to by [defendant] had been estimated to be between five and fifteen minutes. The child was able to get out of the house through an unsecured door and off of a porch with ineffective child barriers.
In the May [11], 2013 case, the victim was [defendant's] nineteen[-]month[-]old daughter, Mercadiez Reed. She was able to leave the home through an unsecured door and gain access to an above ground swimming pool that was about four feet deep. [Defendant's] husband and her children were in or about the home when the victim wandered out of the house. [Defendant] told law enforcement officers that she was in the bathroom for about five to ten *158 minutes when the child probably left the home to go outside. She advised law enforcement that she did not watch the children in the *728 pool because she was uncomfortable due to the previous incident.
Defendant contends that the thirteen findings of fact in the order were "inadequate and incomplete" and thus failed to support the trial court's conclusions of law that the 2010 and 2013 drownings were sufficiently similar to permit admission of the 2010 evidence under Rule 404(b). Specifically, defendant contends that the 2010 drowning of Sadie Gates lacked any similarity to the 2013 drowning of Mercadiez on "the most important issue, supervision[.]"[16] Defendant misperceives the requirements for admission of prior bad acts under Rule 404(b) and the purpose for which the State sought to offer the evidence here.
Defendant notes that while she admitted leaving the victim of the 2010 drowning completely unsupervised, there was voir dire testimony at the pretrial hearing that she left Mercadiez in the same room as Mr. Reed before Mercadiez's drowning.[17] I would conclude that this difference pales in comparison to the numerous similarities between these tragic events. As the trial court noted, both incidents involved (1) 19-month-old children (2) who were being supervised by defendant (3) in her home (4) while her husband and other children were present (5) who drowned (6) in nearby bodies of water (7) after getting out of defendant's home, and (8) when defendant had stepped away from the child's immediate presence for a period of approximately five to ten minutes. Further, the evidence was not offered to prove that defendant failed to supervise Mercadiez, but rather, inter alia , to show defendant's knowledge "of the dangers and possible consequences of failing to supervise a young child who has access to or is exposed to bodies of water[.]" Whether defendant's husband was with Mercadiez when defendant left the room before her daughter escaped from the house and drowned is irrelevant to the issue of defendant's knowledge of the possible consequences of leaving a toddler with unsupervised access to an open source of water. Defendant's knowledge of such danger, in turn, was highly relevant to the jury's determination of her (1) culpable negligence, an element of involuntary manslaughter; (2) reckless disregard for human life, an *159 element of felonious child abuse; and (3) willfully or knowingly allowing a child to be in a situation where the child could be adjudicated neglected, an element of contributing to the neglect of a juvenile. See, e.g. , State v. Fritsch , 351 N.C. 373, 379-80, 526 S.E.2d 451, 456 (2000), cert. denied , 531 U.S. 890, 121 S.Ct. 213, 148 L.Ed.2d 150 (2000) ; see also N.C. Gen. Stat. § 14-316.1 (2015) (defining contributing to delinquency by a parent as "knowingly or willfully caus[ing] ... any juvenile ... to be in a place or condition ... whereby the juvenile could be adjudicated ... neglected"). For these reasons, I agree with the majority that the trial court properly concluded that evidence of the 2010 drowning was admissible under Rule 404(b).
Nonetheless, North Carolina's Rules of Evidence provide that even relevant
evidence may ... be excluded under Rule 403 if the trial court determines its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion. An abuse of discretion results when the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.
State v. Whaley , 362 N.C. 156, 159-60, 655 S.E.2d 388, 390 (2008) (citations and internal quotation marks omitted).
Defendant's appellate argument regarding Rule 403 is simply that evidence of the 2010 drowning was so lacking in probative value that it was outweighed by the obvious prejudice *729 of evidence that another toddler had previously drowned while in defendant's care. While I agree that it was prejudicial, as explained supra , the evidence of the 2010 drowning was also highly probative of the issues before the jury in this case. The trial court noted in its order that it had performed the required Rule 403 balancing test in regard to the 2010 drowning and determined that the probative value of the evidence was not outweighed by unfair prejudice.
My conclusion that this was a reasoned decision is further supported by the trial court's decision to defer ruling until trial on admission of the neighbor's testimony about unsupervised children in defendant's yard and its ruling that evidence about defendant's possible drug use on the date of the 2010 drowning was inadmissible under Rule 403. I see no abuse of discretion in the admission of evidence about the 2010 *160 drowning, and, accordingly, I agree with the statement in the majority opinion that this argument by defendant lacks merit.
III. Motion to dismiss for insufficiency of the evidence
I would also overrule defendant's arguments that the evidence at trial was insufficient to support her convictions for misdemeanor child abuse and contributing to the delinquency of a juvenile by neglect.
Taken together the State's evidence at trial shows that defendant knew (1) how quickly unsupervised toddlers in general could wander away into dangerous situations, (2) that two of her young children, including a toddler who appears to have been Mercadiez, had wandered unsupervised to the edge of the street only the month before, (3) that some of defendant's older children were in the habit of leaving gates open which allowed younger children to wander, (4) how attractive and dangerous open water sources like her backyard pool could be for toddlers, and (5) that defendant had previously been held criminally responsible in the death of a toddler she was babysitting after that child was left unsupervised inside defendant's home for five to fifteen minutes, managed to get outside, and wandered into a creek where she drowned. Despite this knowledge, defendant still chose to (6) leave toddler Mercadiez outside on a side porch (7) supervised only by other children (8) while defendant spent five to ten minutes in a bathroom where she could not see or hear her youngest child.
Regarding her conviction for misdemeanor child abuse, I agree with the assertion in the majority opinion that the most factually analogous case to defendant's is State v. Watkins , --- N.C.App. ----, 785 S.E.2d 175 (2016). In Watkins , the defendant appealed from the denial of her motion to dismiss a charge of misdemeanor child abuse. Id. at ----, 785 S.E.2d at 176. The defendant was charged after her son "James, who was under two years old, was left alone and helpless-outside of [the d]efendant's line of sight[18] -for over six minutes inside a vehicle with one of its windows rolled more than halfway down in 18-degree weather with accompanying sleet, snow, and wind." Id. at ----, 785 S.E.2d at 178.
*161 Given the harsh weather conditions, James' young age, and the danger of him being abducted (or of physical harm being inflicted upon him) due to the window being open more than halfway, we believe a reasonable juror could have found that [the d]efendant "created a substantial risk of physical injury" to him by other than accidental means. See N.C. Gen. Stat. § 14-318.2(a).
[The d]efendant acknowledges that her actions "may not have been advisable[ ] under the circumstances" but argues nevertheless that "this was not a case of child abuse." However, the only question before us in an appeal from the denial of a motion to dismiss is whether a reasonable juror could have concluded that the defendant was guilty based on the evidence presented by the State. If so, even if the case is a close one, it must be resolved by the jury.
*730 See State v. Franklin , 327 N.C. 162, 170, 393 S.E.2d 781, 786-87 (1990) ("Although we concede that this is a close question ... the State's case was sufficient to take the case to the jury."); State v. McElrath , 322 N.C. 1, 10, 366 S.E.2d 442, 447 (1988) (upholding trial court's denial of motion to dismiss even though issue presented was "a very close question").
Id. (emphasis omitted). Mercadiez and James were each left unsupervised by their mothers for a similarly short length of time-five to ten and six minutes, respectively. However, the actual danger to which Mercadiez, who was awake and mobile, was exposed during that time was significantly greater than that faced by James, who was sleeping and confined. While leaving her toddler partially exposed to cold and snowy weather for six minutes was certainly a poor decision by James's mother, it was unlikely to result in death and did not result in any actual injury to him. Indeed, the law enforcement officer who spotted James sleeping in his mother's car did not feel the need to check the child's well-being before the defendant left the scene.[19]
As for the other risk suggested by this Court in Watkins , I would note that the best available statistics indicate that drownings are far more common than nonfamily abductions. In 2015, the National Center *162 for Missing and Exploited Children[20] "assisted law enforcement with more than 13,700 cases of missing children[,]" approximately 1% of which were nonfamily abductions. See The National Center for Missing & Exploited Children, http://www.missingkids.com/KeyFacts (last visited July 6, 2016). The resulting estimate of 137 nonfamily child abductions annually is dwarfed by the approximately 700 children under age 15 who drown in non-boating-related incidents each year. See Centers for Disease Control and Prevention, http://www.cdc.gov/homeandrecreationalsafety/water-safety/waterinjuries-factsheet. html (last visited July 6, 2016) ("From 2005-2014, there were an average of 3,536 fatal unintentional drownings (non-boating related) annually in the United States.... About one in five people who die from drowning are children 14 and younger.").[21] Indeed, "[d]rowning is responsible for more deaths among children [ages] 1-4 than any other cause except congenital anomalies (birth defects)." Id. For children ages 1-4 years, home swimming pools are the most common location for drownings. Id. In addition, "[f]or every child [age 14 and under] who dies from drowning, another five receive emergency department care for nonfatal submersion injuries." Id. Thus, I take issue with the majority opinion's characterization of Mercadiez's drowning as "the exceedingly rare situation that resulted in a tragic accident."[22] The primary distinction I see between this case and Watkins is that Mercadiez was exposed to far greater risk when she was left unsupervised and subsequently drowned.[23] *731 *163 I find wholly unpersuasive the argument that Watkins and defendant's case are distinguishable on the basis of (1) the purposeful action of the parent in each case and (2) the foreseeability of the potential harm to the unattended child:
In Watkins , the defendant was aware of the harsh weather conditions, that the window was rolled down, and that she was leaving her child unattended in a public space; in other words, [the] defendant engaged in the purposeful conduct of leaving her child in the circumstances just enumerated; which is purposeful action that crosses the "accidental" threshold as "physical injury" in this case is very foreseeable, whether by hypothermia or abduction. From a commonsense standpoint, most, if not all parents, know there are inherent and likely dangers in leaving a child entirely alone in an open car in freezing weather in a public parking lot.
(Citation omitted).
First, I do not understand how a parent who left her sleeping child in a car for six minutes while she went into a sheriff's office "engaged in the purposeful conduct of leaving her child in [those] circumstances[,]" but a parent who left her child playing outside near a swimming pool for five to ten minutes while she went into a bathroom did not. Both cases appear to me to involve "the purposeful conduct of leaving [a] child in the circumstances" which the State argued were dangerous. If evidence that a defendant left her sleeping toddler strapped in his car seat alone in a car parked in front of a sheriff's office in cold weather for six minutes was sufficient for "a reasonable juror [to find] that [the d]efendant created a substantial risk of physical injury to him by other than accidental means[,]" see Watkins , --- N.C.App. at ----, 785 S.E.2d at 178 (internal quotation marks omitted), I have no trouble concluding that evidence that a defendant who left her toddler outside without adult supervision for five to ten minutes at a home with an outdoor swimming pool and a pool security gate often left open by other children in the family was likewise sufficient to withstand a motion to dismiss.
*164 Second, regarding foreseeability, I believe that, in addition to being aware of the dangers of child abduction and hypothermia, "[f]rom a commonsense standpoint, most, if not all parents, know there are inherent and likely dangers in leaving a child" outside without supervision near a backyard swimming pool. Further, even if most parents are not aware of the grave danger of drowning for unsupervised young children, defendant was undeniably aware of the risk, given that she was still on probation for her conviction of involuntary manslaughter in connection with Sadie Gate's death at the time of Mercadiez's drowning. As noted supra , defendant was also aware that the gate to the backyard pool was often left open by other children in the home and that two of her younger children had recently been able to wander to the edge of the street while they were at home and in defendant's care.
Finally, I take issue with the assertion in the majority opinion that, if we do not find error in the trial court's denial of defendant's motion to dismiss, "any parent who leaves a small child alone in her own home, for even a moment, could be prosecuted if the child is injured during that time, not because the behavior she engaged in was negligent or different from what all other parents typically do, but simply because [hers] is the exceedingly rare situation that resulted in a tragic accident."[24] Defendant left her toddler outside on a side porch without adult supervision, not for a moment, but for five to ten minutes. Further, the evidence in this case is that defendant knew the risk of a young child drowning when left unsupervised, knew her own young children had a tendency to wander in the yard, and knew her swimming pool *732 was not always securely enclosed, yet still left Mercadiez outside unsupervised for five to ten minutes.
As noted in the majority opinion, defendant's conviction for contributing to the delinquency of a minor was based upon the theory that she "knowingly or willfully cause[d Mercadiez] ... to be in a place or condition" where she "could be adjudicated ... neglected as defined by G.S. 7B-101 [,]" see N.C. Gen. Stat. § 14-316.1, to wit, that Mercadiez did "not receive proper care, supervision , or discipline[,]" see N.C. Gen. Stat. § 7B-101(15) (2015) (emphasis added), from defendant in the moments before she wandered unsupervised into the backyard pool and drowned. For all of the reasons discussed supra , I can hardly conceive of a more textbook definition of failure to properly supervise one's toddler than to leave her outside without supervision for five to ten minutes at a home with a backyard swimming pool and a security gate that is often left ajar.
*165 Further, I reject the assertion in the majority opinion that the State's theory of the case was "that fathers are per se incompetent to care for young children" and that the evidence was insufficient because the State produced "no evidence that defendant reasonably should have known that Mr. Reed was in any way incompetent to supervise Mercadiez when [defendant] went to the bathroom." The State's theory of the case had nothing to do with fathers in general nor with Mr. Reed in particular. Rather, as is clearly shown by the evidence it presented, the State's theory was that defendant left Mercadiez outside with Sarah and her young friends while defendant spent five to ten minutes in a bathroom where defendant could not see Mercadiez, even though defendant was aware that young children left unsupervised could quickly wander into danger such as the family's backyard pool. As discussed in section I of this dissent, when ruling on defendant's motion to dismiss, the trial court could not consider Mr. Reed's testimony that defendant left Mercadiez with him when she went to the bathroom, and, thus, Mr. Reed's competence to supervise Mercadiez was simply irrelevant.
In sum, taken in the light most favorable to the State, I conclude that there was substantial evidence that defendant knowingly "create[d] or allow[ed] to be created a substantial risk of physical injury" to Mercadiez, see N.C. Gen. Stat. § 14-318.2(a), and allowed Mercadiez to be in a situation where she was not properly supervised. See N.C. Gen. Stat. § 14-316.1. While this "evidence [may] not rule out every hypothesis of innocence[,] ... a reasonable inference of defendant's guilt may be drawn from the circumstances, and, thus, it was for the jury to decide whether the facts, taken singly or in combination, satisf[ied it] beyond a reasonable doubt that the defendant [was] actually guilty." See Fritsch , 351 N.C. at 379, 526 S.E.2d at 455 (citation, internal quotation marks, and emphasis omitted). Accordingly, I would hold that the trial court did not err in denying defendant's motion to dismiss.
IV. Failure to intervene ex mero motu during the State's closing argument[25]
In a related argument, defendant contends that the trial court should have intervened ex mero motu to strike the prosecutor's comment during *166 closing argument that "just as she was responsible for the death of Sadie Gates, so, too, is [defendant] responsible for the death of Mercadiez Reed."[26] Specifically, defendant contends that, with this remark, the State was urging the jury to ignore the trial court's Rule 404(b) instruction regarding *733 the purpose for which evidence of the 2010 drowning was received. I am not persuaded.
As an initial matter, I address the proper appellate standard of review for defendant's argument regarding the State's closing remarks to the jury. The majority opinion frames defendant's argument as "that the State went so far beyond the scope of the proper use of the admitted 404(b) evidence in its arguments to the jury that it amounted to plain error in defendant's trial[.]" Asserting that this argument "hinges on the admission of evidence during the trial," the majority applies plain error review. While plain error review may be applied to unpreserved evidentiary issues, as discussed in section II of this dissent supra , defendant did object to the admission of evidence regarding Sadie Gates' drowning under Rules of Evidence 403 and 404(b). See Beckelheimer , 366 N.C. at 130-31, 726 S.E.2d at 158-59 (discussing the appropriate standard of review applied to appellate arguments under Rule 403-abuse of discretion-and Rule 404(b) -de novo ). More importantly, as noted in footnotes 17 and 18 and discussed further below, defendant's sole argument is that the trial court erred in failing to intervene ex mero motu to a single remark made during the State's closing argument. Plain error review is not appropriate for such appellate arguments. See State v. Wolfe , 157 N.C.App. 22, 33, 577 S.E.2d 655, 663 (2003) ("[T]he plain error doctrine is limited to errors in jury instructions and the admission of evidence."), disc. review denied and appeal dismissed , 357 N.C. 255, 583 S.E.2d 289 (2003).
Instead, the correct
standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu . In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of *167 propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.
Jones , 355 N.C. at 133, 558 S.E.2d at 107 (citation omitted). "[C]ounsel are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." State v. Richardson , 342 N.C. 772, 792-93, 467 S.E.2d 685, 697 (1996), cert. denied , 519 U.S. 890, 117 S.Ct. 229, 136 L.Ed.2d 160 (1996). Further, such "comments must be viewed in the context in which they were made and in light of the overall factual circumstances to which they referred." State v. Call , 349 N.C. 382, 420, 508 S.E.2d 496, 519 (1998) (emphasis added).
In addition to applying an incorrect standard of review, the majority opinion mischaracterizes defendant's argument on appeal regarding the State's reference to the death of Sadie Gates in its closing argument to the jury. In support of her contention of gross impropriety in the State's closing argument, defendant argues that:
The State's ... argument in essence encouraged the jury to ignore the trial court's instructions regarding the 404 (b ) evidence , and the basis upon which it was received, i.e., defendant's knowledge of not supervising a minor child, and to find the defendant guilty because it had happened to another child in [defendant's] care.... To suggest to the jury that it ignore a judge's instructions is grossly improper. Knowing the extent of the dispute as to whether the 404(b) [evidence] should have been allowed into evidence, the court upon hearing the State's argument should have stopped the argument of the State and reminded them that the evidence of [the] prior incident involving Sadie Gates was not to be considered to show a propensity on defendant's part, and she was therefore guilty again, as the State was encouraging the jury to so find. "Just as she was responsible for the death of Sadie Gates, so, too, is she responsible for the death of Mercadiez Reed."
(Emphasis added). Thus, defendant's argument is simple and straightforward: that *734 when the challenged remark-"Just as she was responsible for the death of Sadie Gates, so, too, is she responsible for the *168 death of Mercadiez Reed"-was made, the trial judge, ex mero motu , "should have stopped the argument of the State and reminded them that the evidence of [the] prior incident involving Sadie Gates was not to be considered to show a propensity on defendant's part...."
The majority opinion does not directly address defendant's argument, instead undertaking a review of the State's opening statement and direct examination of its witnesses, in addition to portions of its closing argument not challenged by defendant, and focusing on the number of times the State mentioned Sadie's and Mercadiez's names during the trial. In support of its conclusion that "the State used the evidence of Sadie's death far beyond the bounds allowed by the trial court's order[,]" the majority suggests that, because Sadie's name was used almost as frequently as Mercadiez's name was across the State's opening statement, case-in-chief, and closing argument, "[t]he State's use of the evidence regarding Sadie went far beyond showing that defendant was aware of the dangers of water to small children or any other proper purpose as found by the trial court." The majority opinion cites no authority for the proposition that the frequency of reference to evidence admitted under Rule 404(b) throughout a trial is a pertinent consideration in assessing the alleged gross impropriety of a single comment made during a closing argument, or, indeed, on any legal issue. I would simply note that, in considering the appropriate use of Rule 404(b) evidence and in determining whether a prosecutor's remark was so grossly improper that a trial court erred in failing to intervene ex mero motu , precedent requires that we consider the purpose and nature of statements rather than their frequency . See Beckelheimer , 366 N.C. at 130-31, 726 S.E.2d at 159 ; see also Jones , 355 N.C. at 133, 558 S.E.2d at 107-08.
I believe an analysis of defendant's actual argument on appeal can lead only to a conclusion that the State, far from making a grossly improper argument, specifically cautioned the jury against letting its emotions get in the way of a proper consideration of the evidence before it. A review of the challenged remark in context reveals that, while the court did not interrupt the prosecutor to remind the jury of the limited purposes for which the Sadie Gates evidence could be considered, the prosecutor did give the jury an explicit reminder, essentially repeating the limiting instruction given by the trial court:
And just as she was responsible for the death of Sadie Gates, so, too, is she responsible for the death of Mercadiez Reed. Not a sibling, not [Mr.] Reed, but her. She is the person that can and should be held criminally responsible for *169 her daughter's death, because she is the only person who knew of the dangers, who had been negligent before, and who acted in a grossly negligent manner.
Because of Sadie Gates's death, she had knowledge of the dangers of failing to supervise a child. She knew that if you didn't watch a child, bad things can happen and the child can die. Sadie's death gave her direct, firsthand knowledge of that, and also put a greater responsibility on her to ensure that no child under her care is left unsupervised, in a dangerous situation .
Now, you're not here to decide her responsibility for Sadie Gates's death, and that evidence has not been presented to you to anger or inflame you, or prove that she's a bad parent. It's been offered to you, and should be considered by you, for the limited purpose of showing that she had direct knowledge of the dangers of failing to supervise a child who has access to water. It is important, because it shows her conduct rose to the level of gross carelessness or recklessness that amounted to the heedless indifference of safety and rights of others.
(Emphasis added).[27] In my view, when read in context, the comment defendant challenges *735 can only be interpreted as part of the State's argument that the 2010 drowning death of Sadie Gates was evidence of defendant's knowledge of the dangers of leaving a toddler near an accessible source of water, which as noted supra was offered to prove essential elements of both felonious child abuse and involuntary manslaughter. In light of the State's emphasis on the knowledge the 2010 drowning gave defendant about the danger of open water sources to very young children and its explicit reminder of the limited purpose for which the jury could consider that evidence , the challenged remark was not improper, let alone "so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu ." See Jones , 355 N.C. at 133, 558 S.E.2d at 107. I would overrule this argument. *170 V. Conclusion
I would hold that the trial court did not err in denying defendant's motions to dismiss, admitting evidence of Sadie Gates' drowning, or failing to intervene ex mero motu in the State's closing argument.

I disagree, however, with the majority's apparent assertion that the only way to establish a conflict between the State's evidence and defendant's evidence would have been for the State to offer evidence placing Mr. Reed in a different location inside the house from the location Mr. Reed described.

Sarah was nine years old at the time.

This account of his interview with defendant is substantially similar to Kellum's testimony at a pretrial hearing on the admission of Rule 404(b) evidence:
Q And based on your conversations with [defendant], what was your understanding about where [defendant] was and what she was doing immediately prior to this incident?
A She indicated that she was in the bathroom and that a couple of the girls were-some of the other kids in the house were trying to talk to her through the bathroom door. She came-once she came out of the bathroom, she indicated that she saw [Sarah], which was one of the other children in the house, and that was when they realized [Mercadiez] was missing. She asked [Sarah] where the child was, and then the search began to find the child.

I find the majority opinion's characterization of the direct examination of Kellum as "the State's strategic decision to forego calling as a witness the only adult in the house during the relevant time period other than defendant[,]" an unsupported assumption regarding the prosecution's motive. Certainly, the State was focused on proving its case against defendant, but it is equally as reasonable to assume that the prosecutor (and Kellum) were likely very surprised that defendant's trial counsel elected not to ask Kellum on cross-examination whether, during Kellum's interviews with the Reeds, defendant or Mr. Reed mentioned that defendant asked Mr. Reed to watch Mercadiez when defendant went to the bathroom. The failure of defense counsel to undertake this line of inquiry is difficult to understand in that, at a pretrial hearing regarding the admissibility of Rule 404(b) evidence, defendant's trial counsel cross-examined Kellum about the interview and Kellum testified:
According to her statement that she made on the day she was interviewed in the office, she indicated to [Mr. Reed] that she needed to use the restroom; her stomach was bothering her and she was beginning her menstrual cycle. She went to the bathroom, ... which is near the den/kitchen area. She said that the kids ... began talking to her through the door, and [Mr. Reed] shooed them away from the door back to their rooms. When she walked out of the bathroom, she saw [Sarah] in the kitchen and asked where the daughter was, or where [Mercadiez] was, and [Sarah] indicated that she had brought [Mercadiez] into the house 15 minutes prior.
At the same hearing, Kellum described his interview with Mr. Reed on cross-examination as follows:
Q You interviewed Mr. Reed the night of this incident at the hospital, correct?
A I did.
Q Mr. Reed, would you say, told you the same or consistent story regarding his whereabouts that day, where the child was on the night of the accident, as he did three days later?
A Yes, sir. It was quite a bit more limited due to his obvious grief, but, yes, there were little or no inconsistencies.
Q And Mr. Reed also indicated that [defendant] left the child with him in the living room when she went to the bathroom, right?
A He indicated she used the bathroom.
Of course, none of this testimony from the pretrial hearing was evidence at trial, and thus, it was not part of the trial court's consideration when ruling on defendant's motion to dismiss.

This is the "actual evidence from defendant's case [,]" as quoted above and summarized here, that, in my view, "contradicts the State's evidence [,]" quoted at length and summarized on the third through sixth pages of this dissent. (Emphasis added).

In my opinion, these contrasts between the State's and defendant's evidence are a "coherent argument [about] why Mr. Reed's testimony should be disregarded."

Although the subsection caption of defendant's brief alleges that the trial court erred in denying her motion in limine and admitting evidence regarding both the 2010 drowning and the incident when defendant's children were left unsupervised in her front yard, defendant only presents an argument regarding the evidence of Sadie Gates' drowning. Accordingly, defendant's assertion that the trial court erred in admitting evidence about the unsupervised children is deemed abandoned on appeal. See N.C.R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

On appeal, defendant does not argue that the two incidents lacked temporal proximity. See Beckelheimer , 366 N.C. at 131, 726 S.E.2d at 159.

As noted supra , unlike at the trial itself, the defense elicited testimony from Kellum about Mr. Reed's presence in the living room when defendant went to the bathroom on cross-examination at the pretrial hearing.

The evidence was conflicting on this point. The "[d]efendant testified that from where she was standing in the Sheriff's Office she 'could look directly into my car and see my kid[,]' " while the detective who was the primary witness for the State "testified that from where [the d]efendant was positioned in the lobby she could not see her vehicle, which was parked approximately 46 feet away from the front door." Id. at ----, 785 S.E.2d at 176, 177.

The detective testified that he "noticed that [James], who appeared to be sleeping, had a scarf around his neck. Before walking back into the building, [the detective] told [the d]efendant to turn on the vehicle and 'get some heat on that child.' " Id. at ----, 785 S.E.2d at 176.

"The National Center for Missing & Exploited Children opened in 1984 to serve as the nation's clearinghouse on issues related to missing and sexually exploited children. Today NCMEC is authorized by Congress to perform 22 programs and services to assist law enforcement, families and the professionals who serve them." The National Center for Missing & Exploited Children, http://www.missingkids.com/About (last visited July 6, 2016).

The Centers for Disease Control and Prevention is part of the Department of Health and Human Services. See http://www.cdc.gov/about/organization/cio.htm (last visited July 6, 2016).

I would further note the defendant in Watkins was prosecuted even though her child suffered no harm at all, and, apparently, slept peacefully through the six-minute period when he was subjected to substantial risk of physical injury. See Watkins , --- N.C.App. at ----, 785 S.E.2d at 176.

The majority opinion dismisses as "irrelevant" these statistics regarding unintentional drownings, asserting that "most unintentional drownings would likely also be described as 'accidental drownings,' and the issue here is whether the acts were by other than accidental means." (Internal quotation marks omitted). However, section 14-318.2, our misdemeanor child abuse statute, makes it a crime for the parent of a child under age 16 to "allow [ ] to be created a substantial risk of physical injury , upon or to such child by other than accidental means ...." N.C. Gen. Stat. § 14-318.2(a) (2015) (emphasis added). Thus, it is the creation of the risk, rather than any actual harm that may befall a child, that must be "by other than accidental means...." Id. Here, the State's evidence was that defendant decided to leave Mercadiez playing outside without adult supervision while defendant went into a bathroom for five to ten minutes. That decision to walk out of eyesight and earshot of her toddler, which created the risk to Mercadiez, was not an accident, but a conscious, intentional choice. As for the CDC's statistics, I would assume that an unintentional drowning refers to any drowning that is not intentional, i.e., the result of either suicide or homicide.

See footnote 14, supra .

Although the caption of this portion of defendant's brief states that "THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING THE STATE TO ARGUE N.C.G.S. 8C-404(b) EVIDENCE OUTSIDE ITS BASIS FOR ADMISSION[,]" the text of the argument cites only case law regarding "improper closing arguments that fail to provoke [a] timely objection[,]" correctly noting the proper standard of review as stated in State v. Jones , 355 N.C. 117, 558 S.E.2d 97 (2002).

This statement is the only portion of the State's closing argument cited by defendant in her brief. Defendant does quote one other statement made by the State, but notes that it occurred during a hearing on defendant's pretrial motions and thus the jury did not hear it. Accordingly, we need not consider its propriety.

The majority asserts that, "[b]y referencing only the portion of the State's closing argument that stayed within the Rule 404(b) bounds, it is the dissent [that] is taking the use of the evidence out of context." To the contrary, I focus on this portion of the State's closing statement because it includes the remark actually challenged by defendant and the context necessary to address her appellate argument. See, e.g. , Viar v. N.C. Dep't of Transp. , 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) (per curiam).